[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 919 
Kimberly L. Priest Pitts ("the mother") appeals a judgment modifying her divorce judgment. We affirm in part, reverse in part, and remand.
Three children were born of the mother's marriage to Glenn F. Priest ("the father"): Whitney, born on August 15, 1987; Sydney, born on December 29, 1993; and Hunter, born on November 17, 1992.[1]
The parties divorced in June 2001. The divorce judgment awarded the mother primary physical custody of Whitney, Sydney, and Hunter (collectively referred to hereinafter as "the children"), subject to the father's visitation rights. Among other things, it ordered the father to pay child support in the amount of $850 per month.
On January 19, 2005, the father moved the trial court to award him "emergency" custody of the children, alleging that the children's environment was "unstable" because the mother frequently worked out of town. The trial court denied the father's motion seeking "emergency" custody.
On the same day, the father petitioned the trial court to modify the divorce judgment, seeking, among other things, an-award of primary physical custody of the children, an award of child support, and an award of an attorney's fee. Answering, the mother, who acted pro se at various times during this action, counterclaimed, seeking to find the father in arrears regarding his child-support obligation and seeking to compel the father to pay a portion of the child-care and health-care expenses the mother had incurred on the children's behalf. She also petitioned the trial court to appoint a guardian ad litem for the children.[2] Both the mother and the father filed various other motions and pleadings that are not pertinent to the disposition of this appeal.
On November 9, 2006, the trial court held an ore tenus proceeding regarding the parties' petitions. Making specific findings of fact, the trial court entered a judgment modifying the award of primary physical custody from the mother to the father on November 22, 2006. In that judgment, the trial court also awarded the father child support in the amount of $453 per month based, in part, on the trial court's imputing an hourly wage of $13 to the mother. Additionally, the trial court, among other things, denied the mother's requests to find the father in arrears regarding his child-support obligation and to compel the father to pay a portion of the child-care and health-care expenses incurred on the children's behalf. It also denied the mother's petition seeking the appointment of a guardian ad litem for the children.
The mother subsequently filed a post-judgment motion, which was denied by *Page 920 
operation of law. The mother then timely appealed.
On appeal, the mother argues that the trial court erred insofar as it (1) awarded the father primary physical custody of the parties' two minor children, Sydney and Hunter; (2) imputed income to the mother pursuant to Rule 32, Ala. R. Jud. Admin.; (3) denied the mother's petition seeking past-due child support and health-care and child-care expenses; and (4) denied her claim seeking the appointment of a guardian ad litem for the children. The father moves this court to strike from the record on appeal documents the mother submitted to the trial court after the conclusion of the proceeding. Those documents pertained to the father's child-support obligation and his alleged obligation to pay a portion of the health-care and child-care expenses incurred on the children's behalf.
The mother first argues that the trial court erred in requiring the father to satisfy the standard announced in Ex parteMcLendon, 455 So.2d 863 (Ala. 1984), instead of the best-interest-of-the-child standard, in order to prevail on his claim seeking a transfer of primary physical custody from the mother. The mother is apparently under the misapprehension that the best-interest-of-the-child standard is a higher standard of proof than the McLendon standard. Actually, theMcLendon standard is a higher standard of proof; consequently, the mother would not have been prejudiced even if it had been error for the trial court to apply theMcLendon standard instead of the best-interest-of-the-child standard. However, it was not error for the trial court to apply the McLendon standard because the divorce judgment had awarded the mother primary physical custody. See Ex parte Johnson, 673 So.2d 410,413 (Ala. 1994) ("There are different standards for a trial court to use in ruling on questions of child custody. If one parent has previously been granted primary physical custody or if one parent has `given up' legal custody, then an existing custody arrangement will be modified only if the modification materially promotes the best interests and welfare of the child. Ex parte McLendon, 455 So.2d 863, 865-66
(Ala. 1984). If neither parent has previously been given primary physical custody, then the `best interests of the child' standard applies. Ex parte Couch, 521 So.2d 987, 989
(Ala. 1988).").
Next, the mother argues that the trial court erred by modifying the divorce judgment by granting the father primary physical custody of the children. The evidence established the following pertinent facts. But for a short period of time, the father has resided with his mother and stepfather since the parties' divorce. The father works from 7:00 a.m. until 3:30 p.m.
Beginning in 2001, the mother, a safety manager/engineer, obtained employment as a contract employee, which required her to work outside of the State of Alabama. She has worked in several states, which include Texas, North Carolina, Louisiana, and California. The mother testified that it was not financially feasible for her to maintain employment within Alabama. The mother was unemployed at the time of trial.
The father testified that, beginning in 2004, the mother had begun to frequently travel out of the State of Alabama for employment. The evidence established that the mother had worked out of the state for as long as several weeks at a time. The father introduced an exhibit indicating that in 2004 the mother had worked out of town a total of 161 days.
According to the father, Sydney and Hunter had resided with him for a significant amount of time when the mother had worked out of town. The father testified *Page 921 
that since approximately Christmas 2004 the father had had Sydney and Hunter in his care for over one-half of the time. He stated, however, that the mother had refused to allow Sydney and Hunter to reside with him for the entire time that she had been out of town. He further stated that the mother had made arrangements for the children to reside with various relatives and friends of the mother. According to the father, the mother sometimes did not inform him where she was going or how to contact her when she was working out of town.
The mother, on the other hand, testified that, at times, the father had rejected her requests that he care for the children while she worked out of town. She stated that, when her new husband's work schedule rendered him unable to provide care for the children, the children would stay with relatives or friends. The father denied that he had refused to care for the children.
Tina Hook, the mother's sister-in-law, testified that, approximately one-fourth of the time that the children were in the father's care, the father would bring the children to her to babysit. She also testified that, before 2006, the father would bring the children to her to babysit during the time of his scheduled visitation almost one-half of the time. Hook further stated that, about one-fourth of the time that the children were in the father's care, she would care for Sydney and Whitney so that the father could participate in recreational activities with Hunter. Both Hook and the mother testified that the father would find someone to babysit the children so that he could participate in recreational activities.
Furthermore, the mother testified that, during the time of the father's visitation, the father had asked his mother or his former girlfriend to babysit Sydney and Hunter. The father stated that he had taken Sydney and Hunter to spend the night at his former girlfriend's home because they had known her before he had had a romantic relationship with her.
The father testified that Whitney had refused to reside with him during the time that the mother worked out of town and that she had lived with relatives instead. The evidence established that the mother had obtained an apartment for Whitney before she had attained the age of majority. The mother also had provided Whitney money. The father stated that Whitney had no adult supervision while residing in that apartment. The father also testified that Whitney had resided with a male when she was 18 years old. According to the father, Whitney had refused to reside with him because he imposed certain restrictions.
The evidence established that, sometime in 2005, Whitney, while in the company of three other individuals, was arrested when police discovered her and the other three individuals using marijuana. The police also found drug paraphernalia on Whitney's person on this occasion. The father testified that Whitney had told him that she uses marijuana on a daily basis. The week after Whitney's arrest, the father sought treatment for her at a drug-rehabilitation facility. The father testified that the mother, who had been working outside of Alabama when Whitney was arrested, became angry when he informed her that he had taken Whitney to seek treatment. According to the father, the mother had stated that she believed that Whitney did not need to seek treatment and had told Whitney that she was not required to do so. The father testified that he is fearful that Sydney and Hunter will emulate Whitney's behavior if the mother maintains primary physical custody of the minor children. *Page 922 
At trial, Whitney admitted that she had associated with "bad people" and had done "stupid things." However, she testified that the father had suspected that she was using illegal drugs because she had been losing weight. She stated that her weight loss was due to certain health problems and her taking prescription medications. She also stated that the father had repeatedly called her a "crack head."
Whitney testified that she loves the father but does not have a relationship with him. She testified that she believes that the father is overprotective because the father imposes a 9:00 p.m. curfew on weekends and requires her to read books in the summertime.
An August 2001 judgment conditioned the award of physical custody to the mother upon her enrolling the children at the "West Morgan school."[3] However, the evidence established that the mother had removed the children from the rolls of a school within the West Morgan County School System and had enrolled them in a school within the Decatur City School System. She then reenrolled the children in the West Morgan County School System. The mother testified that she had changed the children's schools because Whitney desired to participate in extracurricular activities at a different school and because she wanted to make all the children happy.
Additionally, the father testified that the mother had interfered with his ability to exercise his visitation rights. He stated that the mother had obtained the children from school or had arranged for friends or relatives to retrieve the children from school during the time of his visitation. Bruce Sparkman, the principal at West Morgan Middle School, testified that the mother had told him not to allow the father to retrieve the children from school. The mother denied that she had interfered with the father's visitation rights or with the father's ability to retrieve the children from school.
The standard set forth by our supreme court is as follows:
 "`Where a parent has transferred to another [whether it be a non-parent or the other parent], the custody of [his or her] infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless [he or she] can show that a change of the custody will materially promote [his or her] child's welfare.'
"Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444,445 (1947), quoting the Supreme Court of Virginia,Stringfellow v. Somerville, 95 Va. 701, 29 S.E. 685,687, 40 L.R.A. 623 (1898).
 "Furthermore,
 "`[This] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by *Page 923 
 uprooting the child. Frequent disruptions are to be condemned.'
 "Wood v. Wood, 333 So.2d 826, 828
(Ala.Civ.App. 1976)."
Ex parte McLendon, 455 So.2d at 865-66.[4]
In the case now before us, the trial court found credible the father's testimony tending to establish that he had provided care for the children approximately one-half of the time that the mother had been working out of town within the two years preceding trial. Although the mother testified that the father had, at times, rejected her requests to care for the children during the time she had been working out of town, the trial court could have believed the father's testimony tending to establish the contrary. According to the father, the mother had refused to allow the children to reside with him for the entire time. Rather, she had arranged for the children to reside with various friends and family members. Therefore, the trial court could have concluded that the mother, who failed to allow the children to reside with the father, created an unstable environment during the time that she had worked out of town. Furthermore, the trial court could have concluded that the mother had violated an August 2001 judgment by enrolling the children in different schools in order to make them happy, which further created instability in the children's lives.
Although the trial court received evidence indicating that the father had utilized a babysitter during the times he had been providing care for or exercising visitation with the children, the trial court could have concluded that the father had, at times, obtained a babysitter for Sydney and Whitney so that he could spend time with his son, Hunter.
Additionally, the evidence established that Whitney was arrested after police had discovered her using marijuana and had found drug paraphernalia on her person. The evidence tended to establish that the mother had failed to acknowledge or address Whitney's illegal-drug use — indeed, the mother had told Whitney that she was not required to attend a drug-rehabilitation program. Contrary to the mother's actions, the father addressed Whitney's illegal-drug use by seeking to obtain treatment for her. Furthermore, the evidence also tended to establish that the mother, who obtained an apartment for Whitney during her minority and provided no adult supervision for her, facilitated Whitney's behavior. Additionally, the evidence tended to establish that Whitney's desire not to reside with the father was due to the restrictions the father had imposed.
We, therefore, conclude that the evidence established that a material change in circumstances had occurred since the entry of the last custody judgment. Moreover, we conclude that the evidence established that the benefits of the change in custody, i.e., the father's ability to provide the children with a stable residence, outweigh the detrimental effects of that change. Additionally, considering the mother's actions regarding Whitney, the evidence supports a determination that a change in custody was necessary. Accordingly, we affirm the judgment insofar as it modified the divorce judgment to award the father primary physical custody of Sydney and Hunter. *Page 924 
The mother also argues that the trial court erred by imputing to her an income of $13 an hour. The evidence established that the mother was unemployed at the time of trial. However, the mother testified that she had earned an average of $25 an hour when she had worked out of the state employed in her profession. Although the mother stated that the average rate for positions within the mother's locale is approximately $8 an hour, she testified that she had worked in a position earning $16 an hour. The mother further testified that she had searched for local full-time employment within her profession but that she had been unable to locate such employment. She also stated that she had accepted all job offers within her locale, but those positions were only for short-term employment. However, the mother stated that she had rejected job offers with employers that are outside the mother's locale. The evidence established that the mother had worked as a manager at a local retail store earning $13 an hour.
Rule 32(B)(5), Ala. R. Jud. Admin., provides, in pertinent part:
 "In determining the amount of income to be imputed to a parent who is unemployed or underemployed, the court should determine the employment potential and probable earning level of that parent, based on that parent's recent work history, education, and occupational qualifications, and on the prevailing job opportunities and earning levels in the community."
Based on the evidence indicating that the mother earned $13 an hour as a manager in a local retail store, the evidence supports the trial court's finding that, based on the mother's work history and experience, she could earn at least $13 an hour within Morgan County. Accordingly, we conclude that the trial court did not err in imputing an hourly wage of $13 to the mother.
Next, the mother argues that this court should remand the cause to the trial court to recalculate her child-support obligation because she is presently employed earning $2.13 per hour excluding tips. However, the proper vehicle for the relief that the mother seeks is a new action seeking a modification based upon her having attained employment. Cf. Dunn v. Dunn,891 So.2d 891, 896-97 (Ala.Civ.App. 2004) (concluding that, after the entry of the divorce judgment, the appellant could seek a modification of a child-support award upon the appellee's obtaining additional employment). The mother did not petition for a modification of child support. We decline to remand the cause to the trial court to address that issue.
Next, the mother argues that the trial court erred by denying her petition seeking an arrearage regarding the father's child-support obligation. She also argues that the trial court erred by failing to find the father in arrears regarding his obligation to pay 56% of child-care expenses and 50% of health-care expenses incurred on the children's behalf as ordered in the June 2001 divorce judgment.
According to the mother, she received "no assistance" from the father from April 2000 to September 2001. She further testified that she first received a partial child-support payment from the father in September 2001.
The father testified that he had been current regarding his obligation to pay child support until his employer laid him off in April 2005. Indeed, the father admitted that he did not pay child support after he was laid off. He further testified that he did not pay child support because of his unemployment and because the children had been residing with him for an extended period of time in 2005. During *Page 925 
the proceeding, the father's attorney stipulated that the mother could introduce documentary evidence regarding the father's child-support payment history.
Furthermore, the mother testified that the father had paid only "a few hundred" dollars of "several thousand" dollars of health-care expenses incurred on the children's behalf. The father testified that he had paid the requisite percentage of any child-care or health-care expenses that he had received notice of from the mother. He further testified that, during the times when the mother had worked out of town, he had paid the entire expense incurred when he had accompanied the children to a physician.
After the ore tenus proceeding, the mother submitted a letter brief to the trial court alleging that the father had accrued an arrearage totaling $7,957.51 regarding his obligation to pay a portion of health-care and child-care expenses incurred on the children's behalf. The mother attached to her brief documents in support of her claim. The father then moved to strike from her brief statements regarding the alleged arrearage and documents in support of her claim. The trial court granted that motion.
 [8] This court has previously stated:
 "Court-ordered child support payments become final money judgments on the dates that they accrue and are thereafter immune from change or modification. Motley v. Motley, 505 So.2d 1228
(Ala.Civ.App. 1986). While it is within the discretion of the trial court to modify the amount of child support due in the future, the trial court may not release or discharge child support payments once they have matured and become due under the original divorce decree. Mann v. Mann, 550 So.2d 1028
(Ala.Civ.App. 1989). Further, the trial court may not diminish the amount of arrearage shown. Endress v. Jones, 534 So.2d 307 (Ala.Civ.App. 1988). At most, the trial court has discretion only as to the amount of arrearage by giving credit to the obligated parent for money and gifts given to the child, Sutton v. Sutton, 359 So.2d 392
(Ala.Civ.App. 1978), or for amounts expended while the child lived with the obligated parent or a third party. Nabors v. Nabors, 354 So.2d 277
(Ala.Civ.App. 1978). Where the obligated parent has failed to make child support payments because of financial inability to do so, . . . the trial court may not `forgive' or set aside the accrued arrearage. State Dep't of Human Resources v. Hulsey, 516 So.2d 720 (Ala.Civ.App. 1987)."
Frasemer v. Frasemer, 578 So.2d 1346, 1348-49
(Ala.Civ.App. 1991). Furthermore, "`[a] party may not unilaterally reduce child support payments without the consent of the court.'" Preussel v. Preussel, 874 So.2d 1124,1127 (Ala.Civ.App. 2003) (quoting Phillippi v. State ex rel.Burke, 589 So.2d 1303, 1304 (Ala.Civ.App. 1991)).
The evidence was in dispute regarding whether the father had accrued an arrearage before April 2005. However, the evidence established that the father had not paid child support after he was laid off in April 2005. The evidence further established that the father had unilaterally eliminated his child-support obligation without obtaining a judgment granting him a modification. Because the evidence is undisputed that the father had failed to pay child support after April 2005, we reverse the judgment insofar as it failed to find the father in arrears regarding his child-support obligation.
With respect to the mother's claim that the father had not paid his portion of the child-care and health-care expenses incurred on the children's behalf, the trial *Page 926 
court, as the sole judge of the credibility of the witnesses, could have found the father's testimony that he had paid his portion of those expenses to be credible. SeeWoods v. Woods, 653 So.2d 312, 314 (Ala.Civ.App. 1994) ("In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief." (citing Ostrander v. Ostrander,517 So.2d 3 (Ala.Civ.App. 1987))). Therefore, we conclude that the trial court did not err in denying the mother's claim seeking to recover a portion of the child-care and health-care expenses incurred on the children's behalf.
Furthermore, the mother argues that the trial court erred by stating that it would review documentary evidence of the father's alleged arrearage upon her tendering to the trial court such evidence, but stating in its judgment that it did not consider such evidence. However, the mother fails to cite relevant authority supporting her proposition that the trial court erred on that ground. See Rule 28, Ala. R.App. P. Additionally, if the trial court committed error by failing to consider such evidence, we conclude that its failure is harmless. Considering the father's testimony disputing the arrearages, as previously discussed, any consideration of the mother's evidence would not have required the trial court to reach a different conclusion. See Rule 45, Ala. R.App. P.; see also Allison v. Lee, 333 So.2d 149
(Ala.Civ.App. 1976) (concluding that, although the trial court failed to consider certain admitted evidence, its failure to consider such evidence was harmless error because the consideration of that evidence would not have compelled the trial court to reach a different conclusion). Accordingly, we conclude that the trial court did not commit reversible error in this regard.
Finally, the mother argues that the trial court erred by failing to appoint the children a guardian ad litem. The mother cites Wheeler v. Antinoro, 660 So.2d 1354
(Ala.Civ.App. 1995), and Gunter v. Gunter,911 So.2d 704 (Ala.Civ.App. 2005), in support of her argument. InWheeler, this court reversed the trial court's judgment, concluding that the trial court had erred by failing to appoint a guardian ad litem for certain children when the action pertained to the garnishment of a trust in which those children were beneficiaries. 660 So.2d at 1355. InGunter, we concluded that the trial court had committed reversible error when it failed to appoint a guardian ad litem for the wife's stepdaughter when the divorce judgment awarded the wife certain personal property in which her stepdaughter held an interest. 911 So.2d at 709.
However, Wheeler and Gunter are distinguishable from the case now before us. BothWheeler and Gunter pertained to an award to another party of personal property in which the children in those cases held an interest. In the present case, the trial court did not award a party personal property in which the children held an interest. We, therefore, conclude that the trial court did not err in failing to appoint a guardian ad litem for the children. See McClelland v. McClelland,841 So.2d 1264, 1269 (Ala.Civ.App. 2002) (concluding that the trial court did not exceed its discretion in declining to appoint a guardian ad litem in a divorce proceeding).
In conclusion, we affirm the judgment insofar as it (1) awarded the father primary physical custody of the parties' two minor children, (2) imputed income to the mother, (3) denied the mother's claim seeking allegedly unpaid child-care and health-care expenses, and (4) denied the mother's claim seeking the appointment of a guardian ad litem. We reverse the judgment *Page 927 
insofar as it denied the mother's claim seeking an award of past-due child support. We remand the cause to the trial court for further proceedings consistent with this opinion. We also deny the father's motion to strike.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN and MOORE, JJ., concur.
THOMPSON, P.J., and THOMAS, J., concur in the result, without writing.
[1] Whitney had attained the age of majority at the time of the proceeding in this matter.
[2] The mother had provided the father notice of her proposal to change the children's principal residence pursuant to the Alabama Parent-Child Relationship Protection Act, codified at § 30-3-160, Ala. Code 1975 et seq. However, the record established that the mother subsequently did not seek a change in the children's principal residence. Therefore, that act is inapplicable to the present case.
[3] The record on appeal is unclear whether the trial court entered the August 2001 judgment pursuant to a postjudgment motion or pursuant to a new action.
[4] Recently, our supreme court overruled caselaw requiring a party seeking a modification of custody to establish that the necessity of a change in custody is "obvious and overwhelming."See Ex parte Cleghorn, [Ms.1061014, February 8, 2008] ___ So.2d ___, ___ (Ala. 2008). Accordingly, a party seeking a change in custody is no longer required to meet the obvious-and-overwhelming-necessity standard. Seeid.