MOORE, Judge.
S.L.L., the father, appeals from a judgment transferring custody of H.R.S., the child, to L.S., the mother. We reverse.

Background

On September 4, 2009, the mother filed a petition in the Etowah Juvenile Court seeking to modify custody of the child and seeking to hold the father in contempt of court. The father answered the petition, generally denying the allegations asserted therein. The juvenile court conducted a hearing on the mother’s petition on September 30, 2009; ore tenus evidence was received at that hearing.
On October 26, 2009, the juvenile court entered its “Custody and Visitation Order.” In that judgment, the juvenile court made specific findings of fact and concluded that the mother had met the custody-modification standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984). Thus, the juvenile court ordered a transfer of custody from the father to the mother. The juvenile court found no just reason for delay and, pursuant to Rule 54(b), Ala. R. Civ. P., made the order final. The father timely filed a postjudgment motion, seeking to alter, amend, or vacate the judgment; the juvenile court denied the father’s motion.
The father timely appealed to this court.[1] On appeal, the father asserts that the mother failed to meet the standard set forth in Ex parte McLendon, supra.

Evidentiary Background

The record before us establishes the following. At the time of the custody hearing, the child was five years old. The mother acknowledged that, in September 2006, she had tested positive for cocaine upon the birth of her second child, K.S.[2] At that time, the Department of Human Resources became involved with the family, a dependency petition was eventually filed, and the father was awarded custody of the child.[3] Although the record before this court contains none of the pleadings filed or the orders entered in any of the earlier juvenile-court actions involving the parties, *1274 it appears from references made by the juvenile court and in the parties’ testimony that, on February 26, 2009, the juvenile court awarded the mother and the father joint legal custody of the child with the father remaining the physical custodian of the child.
By September 2009, the mother had filed this petition to modify custody with the juvenile court.[4] At the hearing on her petition, the mother complained that the father had not notified her of a certain field trip scheduled for the child’s kindergarten class and that the father either did not notify her or was unaware that the child’s class was making school pictures on a specified date. The mother testified that she had been forced to communicate with the school to obtain such dates because the father had refused to relay them to her. The mother claimed that she had had similar problems when the child attended pre-kindergarten the preceding year; according to the mother, the father had not notified her of the child’s pre-kindergarten graduation ceremony. The father denied the mother’s version of events and testified that he had merely forgotten the date of the field trip referred to by the mother and that he did not consider school pictures to be an event requiring notice to the mother. He also pointed out that the child had been attending kindergarten for only approximately six weeks at the time of the September 30, 2009, modification hearing.
The mother also testified that she had had difficulty leaving school with the child one day after a field trip. According to the mother, the child’s teacher had indicated to her that the father had instructed the school not to release the child to the mother without the father’s written permission and that, on that occasion, the father had not given his written permission. After the teacher contacted the father to verify that the child could be released to the mother, the mother was able to leave with the child. According to the mother, the father’s failure to place the mother on the school’s “checkout” list was in violation of the juvenile court’s previous order.
The mother alleged that the father had notified her of a dental appointment for the child and that she had taken time off from work to attend that appointment. She then learned that the father or the child’s paternal grandmother had changed the date of the appointment at the last minute without informing the mother. As a result, the mother was required to take *1275 additional time off from work to attend the appointment on the rescheduled day. The father testified that he notified the mother of all scheduled doctor appointments and that he had notified the mother of the correct date for the child’s dental appointment. He testified, however, that when the child has been sick all night and needs to go to the doctor, the mother “is the last thing on my mind in the morning, it’s to get [the child] to the doctor, get him some antibiotic, and get him better, but any doctor’s appointments like for next week or something, [the mother] knows all about it.”
The mother testified that she was unable to reach the child by telephone during the evenings and was forced to continuously telephone the father in an attempt to talk with the child. She testified that she would “call all day long until I can talk to [the child].” The mother testified that she believed that the father and the paternal grandmother were attempting to eliminate the mother from the child’s life. The father complained that the mother called his home telephone and his cellular telephone as many as eight times a day, but, he testified, if the child was available, he was allowed to talk with the mother.
The mother also testified that she had offered to buy school clothes for the child but that the paternal grandmother had told the mother they were not needed. She also complained that she had purchased a pair of “light-up” shoes for the child and that the father or the paternal grandmother had allowed the child to wear the shoes into the river and damage them. The father testified that he initially had not accepted the mother’s offers of assistance because he had not needed the help. The father testified that he eventually told the mother that, if she wanted to help, she could pay a pre-kindergarten bill that remained outstanding.
The mother testified that the father was not actively involved in caring for the child. She testified that the paternal grandmother, rather than the father, was the child’s primary caregiver. The mother explained that the paternal grandmother had recently “blacked out,” causing her to fall and break her ribs; the paternal grandmother was hospitalized as a result of her medical problems. The mother complained that, during the paternal grandmother’s nine-day hospitalization, the father had sent the child out of state to stay with a paternal aunt rather than asking the mother to assist in caring for the child. The father admitted that he had not asked the mother to assist him, and he acknowledged that the mother would not be his first choice to help care for the child because, he testified, the mother would then argue in court that the father had been unable to properly care for the child without the mother’s help.
The father admitted that the paternal grandmother often dressed the child for school, drove the child to school on certain days, and usually picked the child up from school if the father was working. The father acknowledged that he had not yet attended a kindergarten field trip with the child, but, he testified, he had attended field trips during the child’s pre-kindergar-ten year. The mother also testified that the father did not know the name of the child’s current dentist and that the child had significant dental needs. The father could not identify the dentist by name, but he identified the location of the dentist’s office. The mother and the father disagreed as to which dentist to use.
The mother also testified that the father was unaware that the child’s cough syrup *1276 had not been returned with the child on one occasion. The mother testified that she had inadvertently left the cough syrup on her counter and did not discover it there until some time later.[5] At some point after she discovered that she had not returned the medication, the mother called to ask the father if the child had taken all of his cough syrup; the father indicated that the child had finished all of it. The father admitted that he had not been truthful with the mother and testified: “I know I lied, because I [knew] she’d bring it up to me in court.” The father, however, testified that, upon learning that he did not have the cough syrup, he had contacted the child’s pediatrician who had instructed the father that, if the child needed it, to give the child another of his medications instead of the cough syrup.
The mother also testified that the child had missed a large portion of the first two weeks of kindergarten because he had not had received all of the necessary immunizations. The father testified that the child suffered with asthma and that the child had missed school because he had been sick. The father admitted that he had taken the child to the doctor and that, while there, the child had received four shots; the father, however, denied that the child was behind schedule in receiving those shots. The father also testified that one of those shots was a flu shot.
The mother complained because the father had not attended any of the child’s “T-ball” games. According to the mother, she had attended all the child’s practices and all the games but one. The father testified that he had to work on Saturdays, the only day the team played, and, thus, could not attend the games but that he had attended some of the child’s practices.
The mother claimed that she had paid child support to the father, but she admitted that she had never given the father money directly. The mother claimed that she had paid for the child’s school lunches and that she had purchased other items needed by the child, but, she testified, she had refused to give the father money. The mother testified that she did not believe the father would use any money that she gave him for the benefit of the child. The father testified that the mother had given him $25 cash; he also acknowledged that the mother had paid for school lunches and other items, but, he testified, the mother had not paid child support.[6]
The mother acknowledged that she had made mistakes in the past — using cocaine and becoming involved with “Jonathan,” a man having an extensive criminal record and with whom she had engaged in a violent relationship. She testified that she had improved her circumstances significantly since the child had been removed from her custody. The mother testified that she had not used illegal substances since her 2006 positive drug test, that she was no longer seeing “Jonathan,” and that she was now working and attending classes. The mother testified that her schedule was flexible and would allow her to work around the child’s school schedule. She was living with the child’s maternal grandmother, the maternal stepgrandfa-ther, and K.S., the child’s half sister. The *1277 mother acknowledged that the child would attend a different school than the one he was currently attending if custody was awarded to her.
The maternal grandmother testified that she was on disability and regularly took tramadol, a non-narcotic pain medication. She acknowledged that she had been involved in filing the earlier petition to remove custody of the child from the mother. The maternal grandmother explained that the mother had not been making good choices at the time that earlier petition was filed. According to the maternal grandmother, the mother was doing much better now and had continued to improve even after the last hearing, at which the juvenile court had awarded the mother joint legal custody of the child. The maternal grandmother testified that the mother continued to live with her. The maternal grandmother also testified that, although the mother was receiving food stamps, the mother provided financially for both of her children and that the mother worked and attended school. According to the maternal grandmother, the mother provided the majority of KS.’s care and the maternal grandmother cared for K.S. when the mother was working or attending classes. According to the maternal grandmother, the mother had never missed a scheduled visit with the child. The maternal grandmother believed that the child should now be returned to the mother’s custody.
Based on the testimony received ore tenus at the modification hearing, the juvenile court made the following findings:
“When this Court removed the mother as a joint custodian, by Order dated August 27, 2008, the Court placed alternating weekly custody in the father and the maternal grandmother.... The Court was aware that the father lived in the home of the paternal grandmother, and that she would provide a substantial amount of the daily care for the child. The Court has never been confident that the father could provide for this child by himself without assistance. The testimony presented at the recent hearing further convinces the Court that the mother has rehabilitated herself and can provide for the daily care of the child and that the father is still unable to do so without the assistance of the paternal grandmother. The paternal grandmother was not present and did not testify. This causes the Court a great deal of concern. The testimony revealed that the father is not cooperating with the mother and is not providing her with information about the child’s school events and medical needs. The mother had difficulty checking the child out of school despite the 02/26/2009 Order awarding her joint custody, and the father had not signed a permission slip. Shoes purchased by the mother were allowed to be worn by the child in the river. The father was unaware of the child’s picture day at school. The mother is forced to obtain information from the school rather than from the father or the paternal grandmother. The mother took off from work to attend the child’s dentist appointment, and the father had given the mother the wrong date. The mother had to take another day off from work. The mother has experienced difficulty contacting the child at night by telephone. The paternal grandmother had a medical emergency and was hospitalized. Rather than inform the mother and allow her to keep the child during this time, the father sent the child to a paternal aunt out of state. The father attended some *1278 of the child’s T-ball practices but not the games. The father missed a field trip with the child because he had the wrong date. The father did not know the name of the child’s dentist. The father failed to tell the mother of another school outing because he lost the paper. The father or the paternal grandmother changed doctors’ appointments and failed to notify the mother or the maternal grandmother. All of these events convince the Court that [the father] does not intend to cooperate with the mother in a joint shared custody arrangement where he is the primary physical custodian. A change of primary physical custody to the mother will materially promote the child’s best interests and welfare, and the positive good brought about by the change will more than offset the disruptive effect caused by the change.”

Standard of Review

The standard of appellate review of a child-custody judgment based on ore tenus evidence is deferential.
“ ‘When evidence in a child custody case has been presented ore tenus to the trial court, that court’s findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing.’ ”
Burgett v. Burgett, 995 So.2d 907, 912 (Ala.Civ.App.2008) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)).
“ ‘However, even under the ore tenus rule, “[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed.’” B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979)).”
Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala.Civ.App.2007). Moreover, the ore tenus rule does not apply to a trial court’s legal conclusions. Ex parte Cater, 772 So.2d 1117, 1119 (Ala.2000).

Analysis

In order to obtain a custody modification, the mother was required to meet the burden set out in Ex parte McLendon, supra. That standard and its application is well established.
“ ‘In situations in which the parents have joint legal custody, but a previous judicial determination has granted primary physical custody to one parent, the other parent, in order to obtain a change in custody, must meet the burden set out in Ex parte McLendon[, 455 So.2d 863 (Ala.1984)]. See Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ.App.1995). The burden set out in McLendon requires the parent seeking a custody change to demonstrate that a material change in circumstances has occurred since the previous judgment, that the child’s best interests will be materially promoted by a change of custody, and that the benefits of the change will more than offset the inherently disruptive effect resulting from the change in custody. Ex parte McLendon, 455 So.2d at 866.’
“Dean v. Dean, 998 So.2d 1060, 1064-65 (Ala.Civ.App.2008).
*1279 “In order to prove a material change of circumstances, the noncustodial parent must present sufficient evidence indicating (1) that there has been a change in the circumstances existing at the time of the original custody judgment or that facts have been revealed that were unknown at the time of that judgment, see Stephens v. Stephens, 47 Ala.App. 396, 399, 255 So.2d 338, 340-41 (Civ.App.1971), and (2) that the change in circumstances is such as to affect the welfare and best interests of the child. Ford v. Ford, 293 Ala. 743, 310 So.2d 234 (1975). The noncustodial parent does not have to prove that the change in circumstances has adversely affected the welfare of the child, but he or she may satisfy the first element of the McLendon test by proving that the change in circumstances materially promotes the best interests of the child. Id.”
C.D.K.S. v. K.W.K., 40 So.3d 736, 739-740 (Ala.Civ.App.2009). Regarding the burden placed on the parent seeking to modify custody, this court has stated: “ ‘ “[T]his is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child’s healthy growth into adolescence and adulthood.” ’ ” Pitts v. Priest, 990 So.2d 917, 922 (Ala.Civ.App.2008) (quoting Ex parte McLendon, 455 So.2d at 865, quoting in turn Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)).
Based on the record before us, we cannot agree that the mother met her burden of proof. Of all the mother’s complaints, the most significant appeared to be that the father was unable to independently care for the child and that the paternal grandmother, rather than the father, was the primary caregiver for the child. In its “Custody and Visitation Order,” however, the juvenile court acknowledged that, at the time custody of the child was initially awarded to the father, it had been aware that the paternal grandmother “would provide a substantial amount of the daily care for the child.” Because at the time the juvenile court awarded custody of the child to the father the juvenile court fully expected the father to require a significant amount of assistance from the paternal grandmother, the evidence indicating that the paternal grandmother, in fact, provided such assistance to the father does not indicate a change in circumstances warranting a custody modification. See, e.g., Cochran v. Cochran, 5 So.3d 1220, 1229-30 (Ala.2008) (recognizing that conditions or circumstances that, at the time of the initial custody award, were expected to occur and that, in fact, subsequently occurred were not a proper basis for a custody modification).
Additionally, the father’s decision to allow the child to visit with an out-of-state aunt while the paternal grandmother was hospitalized fails to provide a basis for a custody modification. At the time the father allowed the child to visit the out-of-state aunt, the father was vested with primary physical custody, and there is no indication that the visit interfered with the mother’s scheduled visitation.
The remainder of the mother’s complaints—that the father failed to keep her informed of certain upcoming school events and doctor’s appointments scheduled for the child and that she was sometimes unable to reach the child by telephone—are best characterized as an alleged lack of cooperation, which is generally an insufficient basis on which to modify custody. See Rose v. Jackson, 47 *1280 So.3d 273, 275 (Ala.Civ.App.2009) (recognizing that visitation disputes are not an appropriate basis, on their own, on which to modify custody); Foster v. Carden, 515 So.2d 1258, 1260 (Ala.Civ.App.1987) (accord); and Smith v. Smith, 464 So.2d 97, 100 (Ala.Civ.App.1984) (accord). Thus, those allegations, even if true, do not rise to the level necessary to warrant a custody modification.
We also note that the record is almost wholly devoid of evidence tending to show how a custody modification would materially promote the child’s best interests and welfare, as required by Ex parte McLendon, supra. The evidence failed to establish that the father’s alleged omissions in cooperating or communicating with the mother had negatively impacted the child or that the child would significantly benefit from being placed in the mother’s custody. See McLendon, supra; and C.D.K.S. v. K.W.K., 40 So.3d at 739 (recognizing that the change in circumstances relied upon for a custody modification must be such as to affect the welfare and best interests of the child either in an adverse or beneficial manner).
For example, although the mother complained that the father relied heavily on the paternal grandmother to care for the child, the mother also requires assistance in caring for the child when the child is in her custody. The maternal grandmother testified that she cares for the child while the mother works and attends classes. Accordingly, neither the mother nor the father is capable of caring for the child without assistance. Thus, we see no benefit to be gained by the child from a custody modification based upon the father’s reliance on the paternal grandmother to assist with the child while he works.
We further note that, although the mother’s rehabilitation and the positive path on which she appears to be is commendable, such rehabilitation alone is an improper basis for regaining custody. See Ex parte McLendon, 455 So.2d at 866 (“It is not enough that the parent show that she has remarried, reformed her lifestyle, and improved her financial position. The parent seeking the custody change must show not only that she is fit, but also that the change of custody ‘materially promotes’ the child’s best interest and welfare.” (citations omitted)). Because the mother failed to meet the burden of proof required of her by Ex parte McLendon, supra, the judgment of the juvenile court modifying custody is due to be reversed. We remand the cause to the juvenile court for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

. Although the father’s notice of appeal was filed before the juvenile court denied his post-judgment motion, the appeal was held in abeyance pending the disposition of that post-judgment motion. See Rule 4(a)(5), Ala. R.App. P.

. Custody of K.S. is not at issue in this action.

. According to the juvenile court, it had conducted five full hearings "on this matter." The record is unclear if the juvenile court was referring to hearings related to this action, case no. JU-06-545.04, or if the juvenile court was referring to hearings held in connection with previous actions. The record contains only the pleadings filed in the ".04” matter and a transcript of the juvenile court's September 30, 2009, hearing. As a result, the juvenile court's previous custody orders were not made a part of the record in this case, and the record contains conflicting information as *1274 to the date the father obtained custody of the child.

. It appears that the father filed no objection to this petition, even though only six months had elapsed since the juvenile court had last modified custody of the child. Additionally, the parties’ custody dispute was properly before the juvenile court, which had previously adjudicated the dependency of the child. Although Ala.Code 1975, § 12-15-114(a), apart of the new Alabama Juvenile Justice Act in which the original jurisdiction of juvenile courts is addressed, provides that "[a] dependency action shall not include a custody dispute between parents,” Ala.Code 1975, § 12-15-117(a), provides that, "[ojnce a child has been adjudicated dependent, delinquent, or in need of supervision, jurisdiction of the juvenile court shall terminate when the child becomes 21 years of age unless, prior thereto, the judge of the juvenile court terminates its jurisdiction over the case involving the child.” See also W.B.G.M. v. P.S.T., 999 So.2d 971 (Ala.Civ.App.2008) (concluding that, because the juvenile court had previously exercised its jurisdiction and awarded custody of the child at issue, the juvenile court’s jurisdiction over that child continued; decided under the former Alabama Juvenile Justice Act).

. The mother admitted that she had not contacted the father immediately upon discovering the cough syrup in her home because she wanted to see if the father would notice that it was missing; the mother admitted that she was attempting to "make a point” and that the child had not necessarily needed the medication.

. There is no indication in the record that the mother was ordered to pay child support.