MOORE, Judge.
B.M. (“the father”) appeals from a judgment entered by the Geneva Juvenile Court (“the juvenile court”) on May 30, 2014, modifying a previous custody judgment and awarding physical custody of X.M. (“the child”) to J.R. (“the mother”). We reverse the juvenile court’s judgment.

Procedural History

On May 22, 2013, the mother filed in the juvenile court a petition for contempt and a motion for an emergency enforcement order (“the contempt petition”).[1] In pertinent part, the mother alleged that the father had denied her visitation with the child since January 2013 and had failed to participate in counseling as ordered by the juvenile court.[2] The mother sought a finding of contempt against the father and an emergency order directing the sheriff or other local law enforcement to assist the mother in retrieving the child for visitation. The father filed a response to the mother’s petition for contempt and a counterclaim for contempt, alleging, among other things, that the child had contracted scabies and “a severe case of head lice” while in the mother’s care, that the mother had failed or refused to diagnose the problems or to seek medical treatment for the child, that the mother had taken the’child on a trip with the mother’s current boyfriend, that the mother’s boyfriend bad stayed overnight without the knowledge or permission of the father, and that the mother had caused frustration by refusing *163 to abide by the juvenile court’s orders. On July 26, 2013, the juvenile court entered an order indicating that the parties had appeared for a hearing and had agreed to continue the contempt-of-court proceedings to a later date and to abide-by the visitation order that was currently in place and the standards of conduct as ordered by the juvenile court;. that the parties had agreed that the child would visit with the mother for 30 days, which period had begun on July 18, 2013; and that, following the mother’s summer visitation, the parties would resume the visitation.as previously ordered.
On September 19, 2013, the mother filed an amended petition for contempt and for a modification of custody, asserting,- among other things, that the father had failed to assure the child’s attendance at counseling as ordered, had failed to allow the mother visitation with the child, and had failed to comply with the “standards of parental conduct” as ordered by the juvenile court; that the father had “back-handed” the mother, hitting her violently in the face during an argument at Samson Elementary School on September 16, 2013; ahd that the father was residing in Florida’ and leaving the child in the care of others while the father was gone for long'periods. The mother sought emergency temporary custody and, following a hearing, permanent custody of the child. The mother attached to her amended petition her affidavit and a copy of a police report that she had filed, which indicated that the father had “back handed her in the face.”
A hearing was held on March 17, 2014. On May 20, 2014, the juvenile court entered an order granting the mother’s petition to modify custody and awarding the mother joint legal custody and primary physical custody of the child. The juvenile court denied the mother’s petition to hold the father in contempt for his failure to comply with the visitation order and awarded the father visitation with the child. The father filed his notice of appeal to this court on June 3, 2014. Because the juvenile court had failed to rule on the father’s contempt claim, this court reinvested the juvenile court with jurisdiction to rule on that outstanding claim. On remand, the juvenile court entered an order denying the-father’s claim for contempt against the mother.

Facts

The mother “testified that she had lived with the child’s maternal grandmother, who had kicked the mother out of her home in November 2010, and that the maternal grandmother .had .filed a dependency petition regarding the child. According to the mother, although the November 2011 order entered following the filing of that dependency petition had awarded primary physical custody of the child to the father, the child had lived with the mother until June 2012, when, she said, the child had begun living with the father. The mother testified that the juvenile court had ordered the child to attend counseling but that the child had not completed that counseling. She further testified that there had been a period during the summer of 2013 when she had been denied visitation with the child. The mother admitted that, at some point in time,- she had been told that the child had contracted scabies while at her house and that .that was the reason the child had not been allowed to visit her.
The mother testified that the father had been living in the same house since September 2013; that, before the father had obtained his own house, he had lived with R.C. and was rarely at R-.C.’s house when she had taken the child there and picked her up; and that the father also had a house in Defuniak Springs, Florida, where he had lived with his sister. According to the mother, the child had been living with *164 R.C., and, the mother said, she was aware of that because she would pick the child up for visitation at R.C.’s house, and would drop the child off there- 90% of the time. The mother presented as evidence a copy of the registration-profile .form that had been sent home with the child at the beginning of the school year that was in session at the time of the trial; she testified that, on that form, her name and contact information had been scratched out and had been replaced by that of the father, R.O., and R.C.’s wife, E.C. The mother acknowledged that the father’s signature did not appear on that form, that his name was misspelled on the form, and that “he had no acknowledgment.” According to the mother, the child’s school-attendance record revealed that the child had had 10 unexcused absences for the school year in session at the time of the trial; that the child had been checked out of school 18 times, 13 times by either R.C. or E.C. and only twice by the father; and that, in the previous school year, the child had had 27 absences, including 20 unexcused absences.[3] ' The mother testified that the child is a good student and that she was in the elementary honor society, although, she said, the child had received a C in science, which was unusual.
The mother testified that, on one occasion, she had waved the father down in his vehicle to speak to him about “homecoming,” which the child was to participate in; that she and the father had had a disagreement; and that the father, while sitting in his vehicle, had “backhanded” the mother in- the face as she was standing outside the vehicle. The mother testified that she had filed a police report regarding the incident but that she had not proseeut-ed the-action. The mother testified that she had decided to seek custody of the child following that incident. The mother testified that that was the only time' the father had ever struck her.
The mother testified that-the house the father was living in at the time of the trial belonged to the maternal grandmother. The mother testified that the maternal grandmother was manipulative of the father and the child. She testified that she had concerns about the child growing up in the Latino or Mexican/American community because, she said, the male Hispánica are dominant over the females and she did not want the child growing up in such an environment. The mother agreed, however, that no one controlled the maternal grandmother and that men are not necessarily always dominant. The mother testified further that the child had begun playing basketball, that she had contacted the child’s coach to learn the child’s schedule, and that she had-attended the child’s first basketball game. She stated, however, that the child had quit basketball after the first game and that the. child had told her that the father and the maternal grandmother had told the. child that she had to choose whether to continue dancing or playing basketball.
The mother testified that she worked at a Goody’s retail store and as a substitute teacher and that she would have to work on some weekends when she had the child. The mother stated, in pertinent part:
“[The child] needs to live with me, well, because I’m her mother and she’s going to get to where she needs to be. I have never said [the father] is a bad dad, and I will never say [the father] is a bad dad because [the child] loves her daddy *165 and he is a good daddy to her. And I don’t want anybody to ever take that different from me being here in court. He’s a good daddy.
“But he is — he works in Defuniak [Springs], He works all the time. And I’m not sayiiig that in a bad way, because it’s not bad. And she’s a girl and she needs, you know, Mom to do things.
“There are things that she can’t talk to him about. There are times — and not only that, he loves her so much, he lets her do what- she want to, if that makes sense. If she wants to quit ball, it’s fine. If she wants to go do this, it’s fíne.”
The mother testified that the child was nine years old at the time of the trial and that the child had told the mother that she wanted tó stay with the mother but that she did not want to hurt the father’s feelings.
The mother testified' that she did not think the child was in any danger with the father and that, if she were awarded custody, she would not prevent the child from seeing the father. She stated that she had not paid any child support in the two and a half years preceding the trial while the child had been in the custody of the father. The mother admitted that she had been “seeing a guy” that had been charged with conspiracy, but, she said, she had not been charged. She admitted also that, on one occasion, at least one of her other children had gotten out of the car and had tried to walk home to their house and that she had had to call the police. The mother also testified that, at one time, one of her children had left the house very upset and in tears, that that child had gone to the hospital to try to use the telephone to get some help, and that the police had-been called. •
Carey Meadows, a speech-language pathologist at Samson Elementary School, which the child was attending at the time of the trial, testified that she knew,the mother because the mother had worked and volunteered at the school and that the mother was a good mother. • Meadows testified that she had never met the father, but, she said-, she did not work directly with the child,- s,o the father had had no reason to contact Meadows. Meadows testified that she tutored one of R.O.’s children at R.C.’s house, that she had seen the child at R.C.’s house on at least six occasions, and that the child had “seemed very well at home” there. She stated that she had never seén the father at R.O.’s house but that she had been there only during normal workday hours and that, if the father were employed, she would not have expected to see him during those hours.
The father, who does not speak' English and testified with th’e assistance of an interpreter, testified that he had worked in Defuniak Springs for three years before the, trial, that his sister lived in Defuniak Springs and he had stayed with her sometimes on weekends, but that he did not own property there. According to the father, when he had worked in Defuniak Springs, he had left for work at 5:30 a.m, and had left the child with R.C. He also testified that, on those occasions when he had worked late during the week, he had stayed at his sister’s house in Defuniak Springs and the child had stayed with R.C. and E.C. According to the'father, however, at the time of the trial, he was working in Dothan and returned home every night between 6:00 p.m. and-7:00. p.m. The-father testified that, on those occasions when he was late getting home, R.C. and E.C. would take care, of the child and that he considered them to be reasonable and safe caretakers for the child.
The father testified that he had not, denied-the mother visitation,'that the child always' went with the mother, and that he had never declined a request for visitation *166 from the mother. With regard to the altercation- between the mother and the father, the father testified that they had had a disagreement, that the mother had cursed, that he had never struck the mother, and that the police had never questioned him about the incident.
The father, testified further that the child did well in. school, but that her grades had been dropping, that he had been trying to help the child, and that he tells her to do her homework. He testified that the child had wanted to participate in both basketball and dance, that those activities were on the same days and at the same time, and that he had spoken with the child and the child had chosen dance. The father testified that the child wanted to live with him. . The father also stated that the mother and the maternal grandmother scream at the child, that they are mean to her, and that the child did not want to stay with the mother. The father testified that, on one occasion when the mother had had the child, the mother had telephoned him and told him that she needed $400 from him before he could see the child. According to the father, he had lived with R.C. before moving into a two-bedroom house in Samson with his girlfriend and the child; that the- child had her own room in the Samson house; and that they.had been living there for .four or five months at the time of the trial.
R.C. testified that the father had stayed at the father’s sister’s house before he was awarded custody of the child. He stated that the father leaves for work at 5:00 a.m. and that sometimes he does not return from work until different times in the evening. According to R.C., the father spends quality time with the child. R.C. also statefi that, sometimes, for instance if it rains, the father might not work for two days but will then make the time up another day. He testified that the father did not always work such a long schedule.

Discussion

The father argues on appeal that “the evidence did not support a finding that the detriment of uprooting the child was overcome by the potential benefit of doing so.”
“The standard of appellate review of a child-custody judgment based on ore tenus evidence is deferential.
“ ‘ “When evidence in a child custody case has been presented ore tenus to the trial court, that court’s findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing.” ’
“Burgett v. Burgett, 995 So.2d 907, 912 (Ala.Civ.App.2008) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)).
“‘ “However, even under the ore tenus rule, ‘[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion. is clearly erroneous and must- be reversed.’ ” B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979)).
“Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala. Civ.App.2007). Moreover, the ore tenus rule does not apply to a trial court’s legal conclusions. Ex parte Cater, 772 So.2d 1117, 1119 (Ala.2000).”
S.L.L. v. L.S., 47 So.3d 1271, 1278 (Ala.Civ.App.2010).
*167 “In order to obtain a custody modification-, the mother-was required to meet the burden set out in Ex parte McLendon, [455 So.2d 863 (Ala.1984) ]. That standard and its application is well established.
“ ‘ “In situations in which the parents have joint legal custody, but a previous' judicial • determination has granted primary physical custody to one- parent, the other parent, in order to' obtain a change in custom dy, must meet the burden set out in Ex parte McLendon [, 455 So.2d 863 (Ala.1984) ]. See Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ. App.1995). The burden set out in McLendon requires the parent seeking a custody change to demori-strate that a material change in circumstances has occurred since thé previous judgment, that' the child’s best interests will be materially promoted by a change of custody, and that the benefits of the change will more than offset the inherently disruptive effect resulting from the change’ in custody. Ex parte McLendon, 455 So.2d at 866.”
“ ‘Dean v. Dean, 998 So.2d 1060, 1064-65 (Ala.Civ.App.2008);
“‘In order to ’prove a material change of circumstances, the noncustodial parent must present sufficient evidence indicating (1) that there has beén a change in the circumstances existing at the time of the original custody'judgment or that facts have been revealed that were unknown at the time of that judgment, see Stephens v. Stephens, 47 Ala.App. 396, 399, 255 So.2d 338, 340-41 (Civ.App.1971), and (2) that the change in circumstances is such as to affect the welfare arid best-interests of the child. Ford v. Ford, 293 Ala. 743, 310 So.2d 234 (1975). The noncustodial parent does not have to prove that the change >in circumstances has adversely affected the welfare of the child, but he or she may satisfy the first element of the McLendon test by proving that the change in circumstances materially promotes the best interests of the child. IdL
“C.D.K.S. v. K.W.K., 40 So.3d 736, 739-740 (Ala.Civ.App.2009). Regarding the burden placed on tjie parent seeking to modify custody, this court has stated: ‘ “ ‘[T]his is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child’s healthy growth into adolescence and adulthood.’ ” ’ Pitts v. Priest, 990 So.2d 917, 922 (Ala.Civ.App.2008) (quoting Ex parte McLendon, 455 So.2d at 865, quoting in turn Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)).”
S.L.L. v. L.S., 47 So.3d at 1278-79.
In its order modifying custody of the child, the juvenile court stated, in pertinent part:
“The Court having reviewed the evidence presented in this matter finds that the mother has [met] the burden as outlined in [Ex parte ] McLendon [, 455 So.2d 863 (Ala.1984),] ... in this case. First, the evidencef ] tends to show that for several months followirig the agreement of -the parties [the child] resided and was primarily hared for by her mother. The evidence also shows that the father moved from Geneva County contrary to the order of this Court on November 26,2012: The evidence tends to show that the [child] also was living in the home with her other two siblings at the time of the order. The father .., has a work schedule [that] does not permit him to pick, [the child] up from *168 school and she does not see him until late in the evening. The father relies on his wife and the father of [the child’s] siblings to provide care for her following school and sometimes until late in the evening.
“The evidence also tends to show that [the child] misses spending time with her four other siblings who are closer to her age. The evidence tends to show that her detachment from the family structure in the home of [R.C.] and the long work hours that prevent [a] stable family structure in the home of [the father] have created a change in circumstances. The Court finds that modifying custody and granting the petition is in the best interest of the minor child in that she will spend her time with her other sisters and her mother.”
With regard to the juvenile court’s factual findings, we note first that there was no evidence presented whatsoever indicating that the child misses' spending time with her four other siblings, nor does the evidence indicate the age of those siblings, let alone that they are close in age to the child. Although the mother testified that the father was living with his sister in Defuniak Springs, Florida, the father testified that, although he had stayed with his sister on occasion when he had worked in Defuniak Springs, he had not lived there; there was no testimony whatsoever indicating that the child had lived in Defuniak Springs at any-time. The juvenile court also found that the child’s “detachment from the family structure in the home of [R.C.] and the long work hours that prevent of [a] stable family structure in the home of [the father] have created a change in circumstances.” We disagree. There is no indication in the record that the child is detached from the family structure during the times that she spends in the home of R.C. Rather, it appears from the record that the child’s life is stable. The mother admitted that the father is a good father and that the child is not in any danger when she is with the'father. Although the mother testified that the child had actually been living with E.O., both the mother and the father testified that, before he began living in his own house, the father had also lived in R.Q.’s house with the child. Carey Meadows, who testified-on behalf of the mother, stated that the child “seemed very well at homo’’ at R.G.’s house. Thus, the juvenile court’s finding that the child was detached from the family structure when she was in R.O.’s house is not supported by the record on appeal.
Although the juvenile court made no specific findings regarding the child’s attendance at school, the mother asserts on appeal that the child’s record of absences and tardies supports the juvenile court’s judgment. The mother testified that the child had had a number of absences from and tardies to school, but there is no indication that those absences and tardies had caused a decline in the child’s performance at school. Based on the child’s school records, which were entered as exhibits, it appears that the number of unexcused absences were less than the amount testified to by the mother, and there is no indication that the child was being reprimanded by the school for excessive absences or that her absences or tar-dies, whether excused or unexcused, had caused any academic problems for the child. Although both the mother and the father indicated that the child had received a bad grade, the evidence also revealed that the child is a good student, that she is in the elementary honor society, and that she typically makes good grades. There is no evidence in the record indicating what had caused a decline in the child’s performance at school, and the father acknowledged that decline and testified that *169 he was trying to help.the child and that he had told her to do her homework. Although the father admitted that he begins work early and that, on .some occasions, returns home late at night, the father also testified that he had made arrangements with R.C. to care for the child while he was away and that the . child felt at home in R.G.’s house. Additionally, R.G. clarified that the father’s work schedule often depended on the weather, that the father did not always work such a-long schedule, and that the father spends quality time with the child. There is no indication that the father’s work schedule or his arrangement with R.G. to keep the child while he works late hours has affected the child. See T.C.T.B.M. v. B.T., 65 Solid 411, 417 (Ala. Civ.App.2010). Based on the foregoing, we conclude that the evidence fails to support the juvenile court’s finding that the child was deprived of a “stable family structure” while in the home of either R.C. or the father.
Both the father and the. child’s guardian ad litem argue on appeal that the evidence does not support a finding that any benefits of a change in custody will offset the inherently disruptive effect resulting from the change in custody.' We agree. The mother admitted that she had failed to provide any child support for the child while the child had, been in the father’s custody.. She also admitted that one of her other children had gotten out of her car and had tried to walk' home to their house and that another of her children had left the house and had gone to the hospital while very upset and in tears and had tried to use the telephone to get some help, and that both of those incidents had resulted in the police being telephoned. The mother admitted that, at the time of the trial, she had a part-time job and- that she was sometimes at work on the weekends while the child was in her custody. We conclude that the record lacks evidence to support a finding that the child’s best interests would be materially promoted by the change in custody such that the disruptive effect resulting from that change would be offset by any potential benefits. We therefore reverse the juvenile court’s judgment and remand the case for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN and THOMAS, JJ., concur.
DONALDSON, J., dissents, with writing, which THOMPSON, P.J., joins.

. The mother’s May 22, 2013, pleading is styled "Fourth Verified Petition for Contempt and Motion for Emergency Enforcement Order.” In that pleading, the mother indicates that the father had filed a contempt petition on January 11, 2013; that the mother had filed contempt petitions on January 14, March 7, and March 28, 2013; and that each of those petitions had been dismissed because they "bore improper case numbers.” Those previously filed petitions do not appear in the record on appeal. We therefore limit our consideration in this appeal to the mother’s fourth petition for contempt and refer to it simply as "the contempt petition” as though it were the only one filed.

. The mother's contempt petition was filed against both the father and R.C., who is the father of two of the mother’s other children.

. The mother submitted the child's school records as an exhibit. We note that the 27 "absences” testified to by the mother included a number of excused tardies, "doctors excused” reasons for checkout, excused absences, excused checkouts, and unexcused checkouts in addition to unéxcused absences,