Terri Angela Kunkel (mother) and George Douglas Kunkel (father) were divorced on June 15, 1987. The divorce decree placed custody of their one-year-old daughter, Heather Nicole Kunkel (minor child), with her father, as agreed to by the parties' separation agreement. *Page 556 
Less than two months after the divorce decree was rendered, the mother petitioned the trial court to change custody of the minor child to her. Her petition was filed as a Motion for Relief from Judgment or, alternatively, as a Petition to Modify Divorce Decree. Her motion alleged that fraud and duress were perpetrated upon her by the father at the time she signed the separation agreement. Her petition alleged that a material change in circumstances had occurred since the divorce.
The post-judgment motion and petition were heard on September 30, 1987. The trial court took the case under advisement and entered an order on March 30, 1988, transferring custody of the child from the father to the mother. The custody change was made effective on April 15, 1988. The father filed a motion for reconsideration, which was heard on April 12. He attempted to present the testimony of several witnesses, but was largely unable to do so. His offers of proof indicate that the witnesses would have testified regarding the relative fitness of each party to be the child's custodial parent. His motion was denied that same day. The father then filed a motion to stay the judgment pending appeal, which was also denied. This appeal followed.
Rule 60(b)(3), Alabama Rules of Civil Procedure, authorizes relief from a judgment based on the "fraud . . ., misrepresentation, or other misconduct of an adverse party." Although not denominated as such, the mother's post-judgment motion was apparently a 60(b)(3) motion which sought in the alternative to modify the divorce decree.
We will first address the 60(b)(3) motion. A separation agreement incorporated into a divorce decree must be fair, reasonable, and just, and free from fraud, duress, or other coercion. Delchamps v. Delchamps, 449 So.2d 1249
(Ala.Civ.App. 1984); Cary v. Cary, 257 Ala. 431, 59 So.2d 659 (1952). If the agreement was obtained through duress and fraud, then the divorce decree is void. Cary, supra.
The mother maintained that she and the father had an oral understanding that differed from the terms of the written agreement. She also contended that she did not fully understand the contents of the agreement and the consequences of her signing it. She stated that she signed the agreement as drafted by the father's lawyer, however, because of certain threats made to her by the father.
The mother testified on direct examination as follows:
 "Q. [D]id you have an occasion to talk to Mr. Whittaker [the father's lawyer] prior to signing any agreement?
"A. No, sir, I did not.
"Q. How did you come to go sign the agreement? . ..
". . . .
 "A. Well, I signed the agreement that afternoon [June 5]. I signed the agreement that I would give him full custody, because he had said a few things to me. If I gave him full custody, that this would just be on paper. That that would not be considered custody. That I would get to see Heather just as much as he did. And, that we would tell people that it was joint custody. He said that he would take Heather away if I did not sign joint [sic] custody.
"Q. How did he say that he would take her away?
 "A. He said that he would leave with her. Take her from me if I did not sign full custody. And, he also said that he would not pay child support to me at all even if he was ordered to do so. . . .
". . . .
 "Q. At the time or prior to signing the agreement, Terri, did you read the agreement?
 "A. I did not, no. I did not read it for the full content. I was told to read over each page and to initial under his initials, which I did. After I would initial each page, he [Whittaker] said, do you understand what was read. And, I would say yes. But, it was not read to me out loud or anything like that. . . .
". . . .
 "Q. Did you tell Mr. Whittaker what you have just testified that George told *Page 557 
you concerning the signing of this agreement?
"A. No, sir, I did not.
 "Q. Did your — did Mr. Kunkel ever say anything to you concerning litigating the divorce case in court?
 "A. Oh, he said that this would avoid a court battle if I would give him full custody of Heather.
 "Q. Do you know of any witnesses that he was going to subpoena in court?
 "A. I don't know any personally. But, he said that he would try to prove that I was mentally unstable to be a mother — unfit to be a mother if I would take him to court. That I wouldn't be able to win. That he was going to get Heather. He said he had written little things down and he would bring them in himself."
On cross-examination, however, the following testimony was elicited from the mother:
 "Q. Mrs. Kunkel, you testified that you were not represented by an attorney at the time that you signed the agreement giving your former husband the full care, custody, and control of this minor child? Is this right?
"A. Yes, sir.
"Q. Had you talked to anyone before that?
"A. Yes, sir, I had.
"Q. Who had you talked to?
 "A. I talked to a Mr. Reese in Daleville about joint custody.
"Q. Had you talked to Mr. Carmichael before that?
 "A. Yes, sir, about me getting full custody of Heather.
 "Q. And, when you went over there to Mr. Whittaker's office, you didn't go over there totally ignorant about what was going on, did you?
"A. No, sir, I didn't.
"Q. You knew what was going on?
"A. I knew what I was signing, yes.
 "Q. You knew what you were signing, and you knew the contents of it too, didn't you?
"A. Yes, sir.
 "Q. And, you knew that it said that your husband was to have the full care, custody, and control of this child until she reached nineteen, married, or became self-supportive?
"A. Yes, sir.
 "Q. You didn't have any quarrel with that at that time, did you?
"A. No, sir.
". . . .
 "Q. You talked to them [Reese and Reese] about joint custody and full custody?
 "A. Yes, sir, the reason I talked to them about joint custody, because I knew these papers would be considered joint custody.
"Q. Is that all you did in furtherance?
"A. I had him draw up papers about joint custody.
"Q. Who did you have draw up papers?
"A. Mr. Reese in Daleville.
"Q. What did you do with them?
 "A. Those papers were torn up, sir. Because my husband said he would not sign those papers at all.
". . . .
 "Q. Now, when you talked with these lawyers, didn't they talk to you about child support?
"A. Yes, sir, and joint custody. Yes, they did.
". . . .
 "Q. Mrs. Kunkel, isn't it true that in the separation agreement that you had prepared by Reese and Reese lawyers over in Daleville, that it had a provision in there for him to pay child support?
"A. Yes, sir.
 "Q. So, they had, in fact, talked to you about that?
"A. Yes.
 "Q. You understood that he could be required to do that?
"A. Yes, I did."
The testimony of the lawyer who prepared the separation agreement, Richard Whittaker, further contradicted the mother's testimony:
 "Q. And, under what circumstances [were] those documents [separation *Page 558 
agreement and answer and waiver] signed by Mrs. Kunkel?
". . . .
 "A. . . . She read through the agreement. I went over the points with her. . . . I remember asking her specifically about whether or not she was in agreement with the custody provision of her husband versus keeping it in her. She said she was. I asked her if she had talked to her lawyer about this. She said she had spoken to her lawyer. I said if you want to take this to your lawyer and let him look at it, feel free to do so. I don't represent you. Do you understand that? I represent your husband. But, I can draw this paperwork if you have already talked to your lawyer. She said, I've talked to them about it, and they know what they are doing. I said, well, you understand — all I wanted to make sure is the girl understood that she was giving up custody. That her husband was going to be getting custody, and that she would have visitation rights. And, I even went so far to indicate to her that it was my understanding that George had made some type of arrangements for someone to take care of the child while he was working, because he was in the military. She said she understood that.
". . . .
 "Q. Dickey, were you made aware by anyone of any prior agreement that she and her husband might have had?
 "A. When George Kunkel first came to see me, he brought to me some documents that Reese and Reese law firm had prepared.
"Q. That concerned joint custody, didn't it?
 "A. . . . The agreement had something to do with probably some joint custody and some division of property. But, George advised me that he was not in agreement with that. And he had talked back to his wife on it. And, then later we drew up the agreement that has been filed. And that's when I went over it with Mrs. Kunkel that one time. And, she told me that she had talked to her lawyers about it and was aware that she was giving up custody."
The father responded as follows to the mother's allegations that he made threats to get her to sign the agreement.
 "Q. Mr. Kunkel, you heard Terri testify as to the reasons she signed the agreement. And, you're saying none of those things are true. Is that what you are saying?
"A. That's correct.
". . . .
 "Q. She stated to this court that you said that if she attempted to get custody or she got custody that you would take the child away, and she would never see the child again?
"A. Yes, sir, that is an untrue statement.
 "Q. You told her that you could not be ordered or made to pay her child support?
"A. Yes, sir.
". . . .
 "Q. Did you also tell her that you would consider the agreement that she signed granting you custody, that you would consider that joint custody?
"A. No, sir.
"Q. So, you don't know where she got that?
 "A. I know where she got it. The original joint custody agreement — she wanted something that said joint custody. And, she said that Heather would go with me to Fort Campbell.
 "Q. But, you weren't willing to sign anything that said joint custody, were you?
 "A. No, that's correct. . . . What we discussed was, she didn't want to contest it. And, both of us agreed that we didn't want it in court. I said if she wouldn't agree to full custody that I was going to take it to court, and that was what I wanted. Now, that is what was said."
The trial court's order of March 30 made the following pertinent findings of fact:
 "4. Attorney Richard Whittaker advised Defendant of her right to employ her own attorney and even advised Defendant *Page 559 
that it would be in Defendant's best interest to do so.
 "5. Attorney Richard Whittaker personally read to Defendant the terms of the Separation Agreement and other documents made the basis of the divorce action.
". . . .
 "9. The Separation Agreement with its custody provision was executed by Defendant based on the threats and statements by Plaintiff to Defendant; which threats, representations and statements Defendant did believe and in reliance thereupon did execute the Separation Agreement. (See allegations set forth in Defendant's 'MOTION FOR RELIEF FROM JUDGMENT AND IN THE ALTERNATIVE, PETITION TO MODIFY DIVORCE DECREE,' WHICH ALLEGATIONS THIS COURT FINDS TO BE FACT.)"
The evidence does not support the trial court's finding of fraud or duress. A party who seeks to set aside an agreement on the grounds of duress must prove by clear and convincing evidence that the duress existed at the time the agreement was executed. Delchamps, supra. Clear and convincing evidence is not necessarily undisputed proof. Wambles v. Coppage,333 So.2d 829 (Ala.Civ.App. 1976). We understand it to be
 "[t]hat measure or degree of proof which will produce in mind of trier of facts a firm belief or conviction as to allegations sought to be established; it is intermediate, being more than mere preponderance, but not to extent of such certainty as is required beyond reasonable doubt as in criminal cases. Fred C. Walker Agency, Inc. v. Lucas, 215 Va. 535, 211 S.E.2d 88, 92 [1975]."
Black's Law Dictionary 227 (5th ed. 1979). See also, Callahanv. Westinghouse Broadcasting Co., 372 Mass. 582, 363 N.E.2d 240
(1977). This standard was not met.
We are mindful of the presumption of correctness that attends a trial court's findings when evidence has been presented to itore tenus, but if those findings are palpably wrong, manifestly unjust, or unsupported by the evidence, we will reverse.Delchamps, supra. Here, the mother's contention that the parties agreed orally to share custody of the child is disputed. The record reflects that joint custody was discussed, but was rejected by the father. The mother complains about her lack of counsel, but it is clear that she chose not to be represented. As to the alleged threats, there is nothing in the record to support the mother's allegation that the father threatened to disappear with the child. He apparently did tell her he would not pay child support, but she was advised that he could be required to do so. We find very little evidence in support of the mother's contention that the separation agreement was improperly obtained.
Even if the mother did sign the separation agreement based in part on alleged misrepresentations made to her by the father, she had the option of refusing to settle and having her "day in court." She must also prove that she was free from fault or negligence in allowing the judgment of divorce to be entered.Delchamps, supra. The record indicates that she knew the contents of the agreement and knew that, in signing it, she agreed to give up custody of her child. Rule 60(b) should not be used to relieve a party from free and deliberate choices which he or she has made. Grover v. Grover, 516 So.2d 667
(Ala.Civ.App. 1987).
We note that, if the evidence had supported a finding of fraud or duress, the trial court should have granted the 60(b)(3) motion (which would have meant that the original divorce decree was void, ab initio), set that decree of divorce aside, and then proceeded to have an evidentiary hearing on the question of custody of the minor child. Without such a hearing, the court had no evidence upon which it could have determined custody commensurate with the "best interests of the child," the standard applied to an initial custody determination. Exparte Couch, 521 So.2d 987 (Ala. 1988).
We find that, in this case, the mother did not meet her burden of proving fraud and duress by clear and convincing evidence. Therefore, the trial court's factual findings *Page 560 
of improper conduct on the part of the father are due to be reversed. We further find that the original divorce decree is not due to be set aside.
With our disposition of the 60(b)(3) motion, it is now necessary to consider the petition to modify. The trial court's order modifying the divorce decree stated, in pertinent part, as follows:
 "12. Since Plaintiff has moved, a material and continuing change in circumstances exists in that divesting legal care, custody and control of Heather Nicole Kunkel from George Douglas Kunkel and vesting legal care, custody and control of Heather Nicole Kunkel in [her] mother, Terri Angela Kunkel, would materially promote the welfare and best interest of this child as:
 "a. Plaintiff is a single, career member of the United States Army and according to his own testimony is in a very secretive unit which can be '. . . called out at any hour of the night and be sent' to any part of the world and even for extended periods of time.
". . . .
 "e. . . . Plaintiff . . . has not allowed or promoted visitation by the Defendant with the child of the parties even to the date of this hearing. . . .
 "f. This is a child of tender years. The child was approximately 13 months at the time of the parties' divorce and is less than two years of age at the time of this order.
 "g. Terri Angela Kunkel is the fit and proper person to be awarded custody of Heather Nicole Kunkel.
 "This court has on appropriate occasions awarded custody of children to their fathers and divested custody of children from their mothers. This court also believes in finality of decisions; presumes them correct and is very reluctant to set aside custody orders especially when arm's length bargaining results in a settlement of custody issues. However, in the instant case, Terri Angela Kunkel in seeking a change in custody has carried the burden of proof and has established to this court's satisfaction that a change in legal custody of the child of the parties from the Plaintiff to the Defendant '. . . would materially promote the welfare and best interest of Heather Nicole Kunkel' under the circumstances in which the court now finds the parties. (See Ex parte McLendon, 455 So.2d 863 (Ala. 1984), and Wells v. Wells, 484 So.2d 1101 (Ala.Civ.App. 1986), and cases cited therein.)"
The McLendon rule places a heavy burden on a parent seeking a change of custody. Once there is a judgment granting custody to one parent or if one parent has forfeited legal custody, then custody will be changed only if the change would "materially promote" the child's welfare to the extent of overcoming the "inherently disruptive effect caused by uprooting the child."Ex parte McLendon, 455 So.2d 863, 865 (Ala. 1984); see also, Exparte Couch, supra. It is not enough for the parent seeking the change to prove that he or she is a fit custodian. Andrews v.Andrews, 495 So.2d 688 (Ala.Civ.App. 1986). The noncustodial parent must also show that material changes which affect the child's welfare have occurred and that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child. Foster v. Carden,515 So.2d 1258 (Ala.Civ.App. 1987).
At the time the mother sought to regain the custody of the child she voluntarily relinquished, the only change in circumstances which had occurred was that the father had moved from Alabama to Kentucky. The mere fact that a custodial parent has changed his or her residence is not sufficient in and of itself to justify a change in custody. Simmons v. Simmons,507 So.2d 939 (Ala.Civ.App. 1986). The mother was aware at the time she signed the separation agreement that the father had been assigned to a new post and would be taking the child with him. The record reveals no evidence that uprooting this *Page 561 
child from her father's home would materially promote her welfare.
We find that the mother failed to meet the burden imposed byMcLendon. For this reason, we hold that the trial judge's decision was unsupported by the evidence and was, therefore, an abuse of discretion.
Reversal of the trial judge's decision in this case is further supported by his erroneous application of standards other than McLendon in deciding to award custody to the mother. The ore tenus presumption of correctness does not protect the trial court's application of the law to the facts from appellate scrutiny. Sims v. Sims, 515 So.2d 1 (Ala.Civ.App. 1987). First, he applied the tender years doctrine, which was abolished by the Supreme Court of Alabama in Ex parte Devine,398 So.2d 686 (Ala. 1981). The mother is no longer presumed to be the better custodial parent for a young child. Second, the trial judge found that the father's Army career justified divesting him of custody. We note that the father was in the Army at the time of the initial divorce decree, so his continued service in the military was not a relevant consideration in this modification proceeding. Further, we have previously affirmed custody awards to parents in the armed services even outside of the United States. Simmons, supra.
Third, the trial judge used the change in custody to deal with problems that had occurred in providing visitation for the mother with the child. A change in primary custody is not the appropriate solution to disputes over visitation. Foster v.Carden, supra.
We must conclude in this case that the trial court's decision to change custody of the minor child to the mother is due to be reversed and set aside. This case is remanded to the trial court with directions to reinstate the original decree of divorce and to order that custody of Heather Nicole Kunkel be returned to her father instanter. The father shall be allowed to retain custody of the child during the pendency of any further proceedings which may be filed by either party in this matter.
REVERSED AND REMANDED WITH DIRECTIONS.
HOLMES, P.J., and ROBERTSON, J., concur.