Natasha COCHRAN

v.

Dewey COCHRAN III.

2140721 and 2140722.

Court of Civil Appeals of Alabama.

April 29, 2016.

Scott W. Hunter, Daphne, for appellant.

Submitted on appellant's brief only.

DONALDSON, Judge.

In appeal no. 2140721, Natasha Cochran ("the mother") appeals from a judgment of the Mobile Circuit Court ("the trial court") transferring physical custody of C.C. to Dewey Cochran III ("the father"); in appeal no. 2140722, the mother appeals from the trial court's judgment on her petition seeking to hold the father in contempt. Because we are unable to determine whether the trial court applied the standard set forth in *Ex parte McLendon,* 455 So.2d 863 (Ala.1984), in appeal no. 2140721 we reverse the trial court's custody judgment and remand the case for the trial court to apply the *McLendon* standard and to enter an appropriate judgment; because the mother has waived any argument as to the contempt judgment, in appeal no. 2140722 we affirm the trial court's judgment.

In April 2011, the trial court entered a judgment divorcing the mother and the father. Pursuant to the divorce judgment, the mother was vested with sole physical custody of C.C. and her sibling, Ch.C. At the time the divorce judgment was entered, Ch.C. was 12 years old and C.C. was 5 years old. The mother began cohabiting with her paramour in September 2011. On August 2, 2012, the father filed a petition seeking immediate and permanent custody of the children. The trial-court clerk docketed the petition as case no. DR–11–900240.01 ("the .01 case"). In the petition, the father alleged that the children had informed him that they had been physically abused by the mother and her paramour and that the mother's paramour had sexually abused C.C. The father re-

ported the incidents to the Satsuma Police Department. The father alleged that there had been a material change of circumstances because of the alleged abuse and because of statements made by the children, including statements that they wanted to live with him, and that it was in the children's best interests for the father to have custody. The father also sought to prevent the mother from having visitation and to terminate his obligations to pay child support and alimony. The trial court held a hearing on August 3, 2012, on the father's request for an immediate order transferring physical custody to him. From the record, it appears that testimony was taken at that hearing. However, no transcript of that hearing has been provided to this court.

On August 8, 2012, the mother filed an answer denying the father's allegations. The mother alleged that the father was living with his wife in the presence of her children in violation of the trial court's order in a custody case in which the father's wife was a party. Also on August 8, 2012, the mother filed a petition for contempt, in which she alleged that the father had failed to comply with various provisions of their divorce judgment. The trial-court clerk docketed the contempt petition as case no. DR–11–900240.02 ("the .02 case"). In particular, the mother alleged that her automobile had been repossessed due to the father's failure to make the required payments, that the father had not provided proof that he had named the children as irrevocable beneficiaries on his life-insurance policy, and that the father had refused to provide the mother with the address where he exercised visitation with the children.

On August 10, 2012, the trial court issued an interlocutory order transferring custody of both children to the father and suspending all contact between the mother and the children. On August 16, 2012, the trial court entered an order setting aside the provision in the August 10 order suspending the mother's contact with the children. On September 13, 2012, the trial court entered another interlocutory order reaffirming the August 10, 2012, order but specifying certain visitation for the mother and setting the matter for a hearing on January 28, 2013.

On October 11, 2012, the mother filed a motion alleging that the father had failed or refused to enforce the mother's visitation with Ch.C. The father filed a response in which he alleged that he could not force Ch.C., against her wishes, to visit with the mother. The mother filed a reply alleging that the father had failed to enforce her visitation rights with both children. On December 19, 2012, the mother filed a motion to enforce her Christmas visitation. The father filed a response in which he alleged that he could not force the children to visit with their mother against their wishes. It does not appear that the trial court ruled on either of the mother's motions to enforce visitation.

On January 28, 2013, the date originally scheduled for the final hearing, the trial court entered an order continuing the case to June 24, 2013, in response to a motion to continue filed by the mother. On June 24, 2013, the trial court entered an order resetting the case to February 25, 2014, because of the need to schedule more time for the trial than had been anticipated by the trial court.

On January 3, 2014, the mother filed a motion for contempt in which she alleged that the father had refused to allow the mother to exercise Thanksgiving visitation with C.C., although he had allowed visitation with Ch.C. The father filed a response in which he alleged that C.C. had not wanted to visit with the mother and that he should not be held in contempt.

The trial court held a final hearing on February 25, 2014. Before the hearing began, the father moved for a continuance in order for C.C. to submit to a psychological assessment based on information that C.C. had told her school counselor—specifically, that she would commit suicide or run away if she was forced to live with the mother. The trial court declined to continue the trial.

The mother, the father, and both children testified at the hearing. Ch.C. was 15 years old and C.C. was 8 years old at the time of the hearing, and their testimony was taken under seal and is part of the record.

The father testified that he and the children lived with his wife and her five children. He testified that both children had been living with him for approximately 18 months and that he had been their sole source of support during that time. The father testified that Ch.C. had her own room and that C.C. shared a room with his wife's two younger daughters. The father testified that, before he and his wife were married, he and the children lived with his wife's parents while his wife lived in her own residence with her children.

The father lives in the Saraland school district, while the mother lives in the Satsuma school district. The father testified that, after he was awarded temporary custody in August 2012, he moved C.C. to the elementary school in the Saraland district but that Ch.C. remained at her high school in the Satsuma district because she had been involved in extracurricular activities there. The father testified that both children were currently making good grades and that they had been making the same grades before they came to live with him.

The father found inappropriate text messages and pictures on Ch.C.'s phone in October or November 2013, and, as a result, he took away her telephone. The father testified that the children's maternal grandfather had given that telephone to Ch.C. and that the maternal grandfather gave her another telephone after the father took away the first telephone. The father testified that the mother allowed Ch.C. to have the second telephone and lied about it to the father. The father testified that the text-messaging incident was a reason why he did not want Ch.C. to return to the mother's custody.

Ch.C. testified that incidents involving text messages had occurred while she was at both her mother's house and her father's house. Ch.C. testified that the father had asked her and C.C. to lie about various things and to testify that they wanted to live with him. Ch.C. testified that the father had told her and C.C. that he would go to jail if they did not lie. Ch.C. testified that she, C.C., and the father had always lived with the father's wife and her children but that the father instructed her and C.C. to lie and to testify that they had lived with his wife's parents. Ch.C. testified that she had been staying "pretty consistently" with the mother since June 2013. Ch.C. testified that, when she had been at the mother's house, the mother's former paramour had not been there. Ch.C. also testified that she and C.C. interacted more when they were at their mother's house than when they were at their father's house. It was undisputed that, at the time of the hearing, Ch.C. wanted to live with the mother.

C.C. testified that she wanted to live with the father. She testified that she did not feel safe when she was at the mother's house, although she did not specify her reasons. C.C. denied the allegation that the father had instructed her to lie or to testify that she wanted to live with him. C.C. testified that, before the father and his wife were married, she, Ch.C., and the father had lived with his wife's parents.

When C.C. was pressed about this issue, she apparently began to cry, and she said that sometimes they had stayed at the father's wife's house. C.C. also testified that the mother had promised her an iPod media-storage device if she would testify that she wanted to live with the mother. C.C. testified that she loves the mother, that she wants to visit with the mother, but that she wants to live with the father. C.C. also testified that she had told her school counselor the day before the hearing that, if she had to live with the mother, she would either kill herself or run away.

The mother testified that the children should live with her. She testified that C.C.'s alleged molester moved out of her house in August 2012. She testified that she had not had any physical contact with him since he moved out, but she admitted that she had exchanged text messages with him in April 2013. She also testified that her former paramour had since married. The mother testified that Ch.C. had visited her regularly since the August 2012 interlocutory order awarding the father temporary custody had been entered, but that C.C. had not. She testified that she had a three-bedroom house and that the children would each have their own bedroom if she retained physical custody. The mother testified that she would allow C.C. to remain in the Saraland school for the remainder of the school year but that she would transfer her back to the Satsuma school district the following school year.

At the conclusion of the February 25, 2014, hearing, the trial court stated in open court that the Ch.C. would be allowed to live with the mother. There is no indication in the record that the trial court reduced this ruling to a written order before the entry of the final judgment. The trial court also announced that it would recess the trial and would withhold entering a final judgment to allow C.C. to undergo a psychological evaluation.

On March 21, 2014, the mother filed a motion alleging that the father had not provided the mother with information or access concerning C.C.'s psychological evaluation in compliance with a previous order entered by the trial court. It does not appear from the record that the trial court took any action on that motion. However, on August 20, 2014, the trial court ordered C.C.'s psychologist to produce records and appear at the next hearing.

On January 26, 2015, a hearing was held. The transcript of that review hearing is not contained in the record on appeal and no order was entered reflecting what occurred at the hearing. The record does not contain any testimony or a report from the psychologist who was to examine C.C.

On February 10, 2015, the trial court entered a final judgment in both the .01 and .02 cases vesting physical custody of C.C. with the father, physical custody of Ch.C. with the mother, and ordering visitation periods for the respective parents to be exercised in a manner so that the children would be together during all visitation periods. The trial court's judgment purported to apply to the .02 case as well; however, none of the issues raised in the mother's contempt petition were specifically addressed in that judgment. The judgment does not contain any findings of fact or any conclusions of law.

On March 12, 2015, the mother filed a motion for a new trial or, in the alternative, to alter, amend, or vacate the judgment. In the motion, the mother argued that the trial court had failed to properly consider the evidence and that the trial court's resolution of the facts was plainly and palpably wrong. The mother asserted that there had not been an appropriate change of circumstances warranting a

change of physical custody of C.C. and that C.C.'s best interests were not materially promoted by the transfer of custody to the father. The mother also sought to introduce evidence from the divorce action involving father's wife and her previous husband and alleged that the father was manipulating the children. The mother filed another motion in which she asserted that the trial court's February 10, 2015, order was not final because, she said, it did not resolve the mother's petition for contempt in the .02 case.

On April 6, 2015, the father filed a response to the mother's postjudgment motion in which he asserted that C.C.'s best interests were materially promoted by the change of custody and that the benefit of the change outweighed its detriment. The father also objected to the inclusion of the information contained in the mother's motion relating to evidence in the father's wife's divorce case. On May 22, 2015, the mother filed a supplement to her postjudgment motion; she attached a letter from a psychologist referenced in her motion that she had inadvertently not attached to that motion.[1]

On June 4, 2015, the trial court held a hearing on the mother's postjudgment motions. When asked what they wanted to put on the record, the parties discussed only their settlement of the mother's contempt petition in the .02 case. The trial court entered an order that same day in both the .01 case and the .02 case, awarding the mother $6,500 based on the repossession of her vehicle caused by the father's failure to make the payments on that vehicle as required by the parties' divorce judgment, and specifically stating that "all other requests not otherwise specifically addressed by this Order shall be

deemed denied." The mother filed a notice of appeal on June 8, 2015, in both the .01 case and the .02 case. The appeal in the .01 case was assigned appeal no. 2140721, and the appeal in the .02 case was assigned appeal no. 2140722. The appeals have been consolidated by this court ex mero motu. The mother filed an appellate brief; the father did not.

■ As an initial matter, we note that the mother has not raised any argument relating to the trial court's judgment entered in the .02 case—the case involving her contempt petition. As a result, she has waived any argument as to that judgment, and, appeal no. 2140722, the contempt judgment is therefore affirmed. See *Boshell v. Keith*, 418 So.2d 89, 92 (Ala.1982)("When an appellant fails to argue an issue in its brief, that issue is waived.").

■ As for appeal no. 2140721, challenging the custody judgment in the .01 case, the mother argues that it is unclear whether the trial court applied the custody-modification standard set out in *Ex parte McLendon*, 455 So.2d 863 (Ala.1984), in changing physical custody of C.C. from the mother to the father. The mother also argues that there was not a material change in circumstances that warranted a custody modification, that the trial court inappropriately based the judgment on C.C.'s preference to live with the father, and that the trial court erred in separating the siblings.

■ We note first that custody was changed following trial proceedings at which evidence was presented ore tenus to the trial court.

---

1. The letter contains information relating to the father's wife's pending custody case and

does not involve the children in this case.

"When evidence in a child custody case has been presented *ore tenus* to the trial court, that court's findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination—it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented *ore tenus* before the trial court in a custody hearing. See *Ex parte Perkins*, 646 So.2d 46, 47 (Ala. 1994), wherein this Court, quoting *Phillips v. Phillips*, 622 So.2d 410, 412(Ala.Civ.App.1993), set out the well-established rule:

" " 'Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, *Payne v. Payne*, 550 So.2d 440 (Ala. Civ.App.1989), and *Vail v. Vail*, 532 So.2d 639 (Ala.Civ.App.1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. *Gamble v. Gamble*, 562 So.2d 1343 (Ala.Civ.App.1990); *Flowers v. Flowers*, 479 So.2d 1257 (Ala.Civ.App. 1985).'"'

"It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous."

*Ex parte Bryowsky*, 676 So.2d 1322, 1324 (Ala.1996).

■ Because the mother previously had been granted sole physical custody of the children, the trial court was required to apply the *McLendon* standard.

"The law is well settled that '[a] parent seeking to modify a custody judgment awarding primary physical custody to the other parent must meet the standard for modification of custody set forth in *Ex parte McLendon[*, 455 So.2d 863 (Ala.1984) ].' *Adams v. Adams*, 21 So.3d 1247, 1252 (Ala.Civ.App.2009). The custody-modification standard set forth in *Ex parte McLendon*, 455 So.2d 863 (Ala.1984), requires that

" 'the noncustodial parent seeking a change of custody must demonstrate (1) "that he or she is a fit custodian"; (2) "that material changes which affect the child's welfare have occurred"; and (3) "that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child." *Kunkel v. Kunkel*, 547 So.2d 555, 560 (Ala.Civ. App.1989) (citing, among other cases, *Ex parte McLendon*, 455 So.2d 863, 865–66 (Ala.1984)(setting forth three factors a noncustodial parent must demonstrate in order to modify custody)).'

"*McCormick v. Ethridge*, 15 So.3d 524, 527 (Ala.Civ.App.2008). It is not sufficient for a noncustodial parent seeking a modification of custody to show that he or she is a fit custodian. *Id.* The noncustodial parent must prove all three *McLendon* factors in order to warrant a modification of custody. *Id.*"

*Walker v. Lanier*, 180 So.3d 39, 42 (Ala. Civ.App.2015).

■ The mother argues that this court should reverse the judgment of the trial court because, she argues, it is unclear whether the trial court applied the *McLendon* standard. The trial court

transferred temporary custody of the children to the father after a hearing in August 2012. One and a half years later, the trial court began the trial on February 25, 2014. The trial court recessed the proceedings for the father to explore C.C.'s psychological condition and then apparently resumed the proceedings on January 26, 2015. The trial court did not enter a final judgment until February 10, 2015. Regardless of any temporary orders, the father had the burden of meeting the standard set forth in *McLendon*.

"Under *Ex parte McLendon*, a final judgment awarding one parent primary physical custody of a child creates a 'rule of repose' by which it is presumed that the child should remain in the custody of that parent unless and until a material change of circumstances indicates that the positive good to the child resulting from a transfer of physical custody would outweigh the inherently disruptive effects of such a change. 455 So.2d at 865 (quoting *Wood v. Wood*, 333 So.2d 826, 828 (Ala.Civ.App.1976)). The noncustodial parent, as defined by the last 'final' custody judgment, bears the burden of meeting the *McLendon* standard, even if that parent has gained temporary custody of the child pursuant to a pendente lite order. It is reversible error for a trial court to relieve the noncustodial parent of that burden based on its pendente lite custody award. *See Ex parte R.C.L.*, 627 So.2d 920, 921–22 (Ala.1993) (recognizing that *McLendon, supra*, does not apply to a pendente lite order transferring custody of a child during the pendency of custody litigation, and, as a result, the presumption in favor of a natural parent over a nonparent is not defeated by such an order); and *Sims v. Sims*, 515 So.2d 1, 3 (Ala.Civ.App.1987) (recognizing in a custody-modification action that the en-

try of a pendente lite order transferring custody of a child during the pendency of that litigation did not shift the burden of proof under *McLendon, supra*, to the parent seeking to retain custody; the burden of proof remained on the noncustodial parent as it had been before entry of the pendente lite order)."

*McCulloch v. Campbell*, 60 So.3d 909, 916 (Ala.Civ.App.2010). In order to warrant a modification of custody, the father had the burden of proving, in addition to the other *McLendon* factors, that a material change in circumstance had occurred.

The mother asserts that, because the father's petition to modify custody rested primarily on the allegation that the mother's former paramour had molested C.C. and because the mother discontinued her involvement with her former paramour and no longer lived with him at the time of the trial proceedings, there were no changed circumstances to warrant the modification. The mother relies on *Walker, supra*.

In *Walker*, the mother in that case petitioned to modify custody of her two children based on her allegations that the father in that case had physically abused the children. There was a significant delay between the final hearing and entry of final judgment, which had awarded the parties joint physical custody. The father appealed and asserted that the mother had not shown that there had been a material change in circumstances. This court could not determine which standard the trial court had applied in awarding joint physical custody. The only evidence in the record that could support a showing that there had been a material change in circumstances involved the allegations of domestic violence. We noted that, on one hand, the trial court's award of joint physical custody could indicate that the trial court did not make a finding of domestic

violence but that, the other hand, because the trial court had modified custody, the custody award could indicate that the trial court did make a finding that domestic violence had occurred and that it amounted to a material change in circumstances. Because we were unable to determine whether the trial court had applied the *McLendon* standard, we reversed the judgment and remanded the case. *Walker, supra.*

In this case, the trial court made no findings of fact in its judgment, and it did not announce any findings in any trial proceedings contained in the record. It is unclear whether the trial court found that any abuse of C.C. had occurred. The evidence indicated that the father initially filed the petition to modify custody based on the allegations that the mother's former paramour, with whom the mother had lived, had molested C.C. The evidence showed that the former paramour had moved out of the mother's residence, that the allegations against the former paramour had not resulted in any ongoing prosecution or conviction relating to any abuse of C.C., and that the Department of Human Resources, which had investigated the abuse allegations, had not found any wrongdoing by the former paramour. However, the record contains testimony from C.C. indicating that she did not feel safe in the mother's house and the evidence indicated that C.C. had told her school counselor that she would run away or commit suicide if she was forced to live with the mother.

When asked at trial why C.C. should live with him instead of the mother, the father testified: "Because of the stuff that she's been through, and that she wants to live with us, and I think I can take care of her better than her mother can." He testified that he had filed the custody-modification petition to keep the children out of "harm's

way." When asked if there were any other reasons why he should have custody of the children, the father said: "Just, they've been through enough changes, from school to schools, I think they—they get taken care of at my house, and I'm going to protect them with whatever I can to make sure they stay safe." The father also testified that he would be willing to split custody of the children by his having custody of C.C. and the mother's having custody of Ch.C.

The record shows that, at the conclusion of the hearing on February 25, 2014, the trial court expressly decided to "recess" the proceedings so that C.C. could undergo psychological evaluation. The trial court entered an order in August 2014 ordering the psychologist to appear with records at the next hearing. The next hearing indicated in the record was apparently held on January 26, 2015. A final judgment was entered one month later. The record does not contain a transcript or other reference to what occurred at the January 26, 2015, hearing, nor does it contain any evidence regarding an assessment completed by a psychologist regarding C.C.

■ It is apparent that C.C.'s safety and mental welfare were the primary factors to be considered in this custody decision, so much so that the trial court ordered psychological services to be rendered to her. If the record indicated that the January 26, 2015, hearing was a continuation of the trial proceedings recessed in February 2014 and that evidence was presented to the trial court in that proceeding that formed a basis for the judgment, we could presume that the judgment was supported by evidence that was not made a part of the record on appeal and, thus, affirm the judgment.

"Alabama law is well settled that an ' "appellant has the burden of ensuring that the record contains sufficient evi-

dence to warrant reversal." ' *Leeth v. Jim Walter Homes, Inc.,* 789 So.2d 243, 247 (Ala.Civ.App.2000) (quoting *Newman v. State,* 623 So.2d 1171, 1172 (Ala.Civ.App.1993)). In addition, when a trial court's judgment ' "is based on evidence that is not before the appellate court, we conclusively presume that the court's judgment is supported by the evidence. *Mitchell v. Mitchell,* 506 So.2d 1009 (Ala.Civ.App.1987)." ' *Leeth,* 789 So.2d at 247 (quoting *Newman,* 623 So.2d at 1172); *see also Smith v. Smith,* 596 So.2d 1 (Ala.1992)."

*Scott v. Scott,* 915 So.2d 577, 580 (Ala.Civ.App.2005).

However, the judgment here contains no reference to any evidence from the psychologist, and we cannot ascertain from any other part of the record whether any evidence was presented following the recess of the trial in February 2014. As noted previously, the father failed to file a brief with this court.

More importantly, it is unclear whether the trial court applied the *McLendon* standard in modifying custody. The trial court made no specific findings of fact or conclusions of law in its final judgment. We agree with the mother that it cannot be determined whether the *McLendon* standard was applied. Therefore, we reverse the judgment entered in the .01 case and remand the case to the trial court to apply the *McLendon* standard to the evidence received and to enter an appropriate judgment. See *Walker, supra.*

Based on our resolution in appeal no. 2140721, we pretermit discussion of the mother's other arguments regarding whether C.C.'s custodial preference was sufficient to support the judgment and whether the siblings should have been separated.

2140721—REVERSED AND REMANDED.

THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.

MOORE, J., concurs in the result, without writing.

2140722—AFFIRMED.

THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.