Rel: July 11, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

─────────────────────────

## CL-2025-0222

─────────────────────────

## K.M.

## v.

## B.W.C.

## Appeal from Limestone Juvenile Court
## (CS-12-900110.04)

MOORE, Presiding Judge.

K.M. ("the mother") appeals from a judgment entered by the

Limestone Juvenile Court ("the juvenile court") that, among other things,

modified the custody of K.R.M. ("the child") and declined to hold B.W.C.

("the father") in contempt of court. We affirm the judgment in part and reverse the judgment in part.

Background

The child was born on April 6, 2012, to the mother and the father, who were not married. According to the father, the juvenile court entered an order on April 25, 2013, that incorporated an agreement of the parties, pursuant to which, he said, the parties were awarded joint legal custody of the child, the mother was awarded sole physical custody of the child, subject to the father's graduated visitation schedule, and the father was directed to pay child support to the mother. Before the commencement of this action, the parties had been before the juvenile court on at least two additional occasions, and, according to the father, the most recent judgment was entered in March 2022 ("the 2022 judgment"). The father acknowledged that the 2022 judgment awarded the mother sole physical custody of the child and awarded him standard visitation, which he exercised on the first and third weekends of the month, on Thursday evenings after school until the following morning, and on rotating holidays and which was to be supervised by the child's paternal grandmother, G.C. ("the paternal grandmother"). Additionally, the 2022

judgment awarded the mother $17,682.06, representing the father's unpaid child-support arrearages.

On March 8, 2024, the father filed a petition to modify the child's custody; he asserted, among other things, that the child "is desirous of living away from the [mother's] current husband," that there is a "contentious relationship between the child and her stepfather," and that he had "recently bec[o]me aware that the stepfather [had] slapped the … child in the face" and that that "may not have been an isolated incident." The father sought an award of sole physical custody of the child and an accompanying modification of child support. On March 22, 2024, the mother, appearing pro se, filed an answer to the father's petition. On April 29, 2024, counsel filed a notice of appearance on behalf of the mother, and the mother filed an amended answer and a counterclaim in which she sought an award of sole legal custody of the child, an order prohibiting the child from using social media at the father's house, an order calculating and awarding interest on the father's outstanding child-support arrearage, and an order increasing the father's monthly payments toward that arrearage. The father filed a reply to the mother's counterclaim. On November 1, 2024, the mother filed a motion seeking

to hold the father in contempt, in which she asserted that the father had frequently visited the child unsupervised in contravention of the 2022 judgment.

On February 18, 2025, a trial was conducted; the mother was not present at the trial, but she was represented by counsel. On March 3, 2025, the juvenile court entered a judgment modifying custody of the child by awarding the father sole physical custody, subject to an award of standard visitation to the mother. The juvenile court declined to award child support and denied all remaining requested relief by the parties. On March 4, 2025, the mother filed a postjudgment motion. On March 27, 2025, the mother filed her notice of appeal to this court. The mother's notice of appeal was held in abeyance until April 1, 2025, when her postjudgment motion was denied by operation of law.[1] See Rule 1(B), Ala. R. Juv. P., and Rule 4(a)(5), Ala. R. App. P.

---

[1]On March 5, 2025, the juvenile court entered an order setting the mother's postjudgment motion for a hearing to be held on April 1, 2025. On that same day, in response to a motion filed by the mother, the juvenile court entered an order that we interpret as an order extending the 14-day period for ruling on the mother's postjudgment motion for an additional 14 days. See Rule 1(B)(1), Ala. R. Juv. P. On April 2, 2025, following the April 1, 2025, hearing, the juvenile court purported to enter an order denying the mother's postjudgment motion. Because the juvenile court's 14-day extension to rule on the mother's postjudgment

4

<u>Facts</u>

The father admitted that the requirement in the 2022 judgment that his visitation with the child be supervised by the paternal grandmother, with whom he resides, had been based on his having enrolled in a pretrial-diversion program. He testified that, over time, he had observed that the child, who was 12 years old at the time of the trial, was demonstrating negative emotions when she arrived at the father's house for visitation after leaving the mother's house and again before leaving the father's house to return to the mother's house. The father stated that the child had expressed eagerness when the time came for her to visit the father, "[l]ike she was being set free almost," and that she had expressed sadness and had appeared "regretful" to return to the mother and "didn't care to go back" to the mother's house.

The father testified that the mother had entered into a relationship with another man ("the stepfather")[2] shortly after the child was born,

---

motion expired on April 1, 2025, however, the motion was deemed denied by operation of law on that date. <u>See</u> Rule 1(B).

[2]Although both the mother and the father made references to the mother's current "husband" and referred to him as the child's stepfather in their respective pleadings, the father testified that he was uncertain whether the mother and the stepfather are legally married. We refer to

that the stepfather has an older daughter ("the stepsister"), that the mother and the stepfather have a four-year-old son together ("the half brother"), and that the child resides with the mother, the stepfather, the stepsister, and the half brother. According to the father, at some point, the child had expressed that she did not want to be around the stepfather; he said that he had attributed the child's negative emotions to her home life with the mother. He stated that, on one occasion before he filed his modification petition, the child had arrived at his house for a visit and had appeared uncomfortable and that, on another occasion, she had shown him some bruising on the back of her leg. The paternal grandmother also testified that she had occasionally seen bruises on the child. She stated that she did not know where the bruises had come from, that she knew that the child would fight with the stepsister, and that she knew that the stepfather "might be a little bit rough" but that she did not know "if he's playing or what." The paternal grandmother stated that she and the mother often communicated via text messages but that she

the man with whom the mother is in a relationship as "the stepfather" based on repeated references to him as such throughout the record on appeal.

6

had not sent a text message to the mother regarding the bruising on the child.

The paternal grandmother testified that she and the mother had exchanged text messages regarding the child's use of social media when she was visiting the father. She stated that, a few years before the trial, the child had been permitted to use the paternal grandmother's cellular telephone and the father's old cellular telephone to connect to the Internet and that the mother had expressed her disapproval and concerns because the child had posted inappropriate photographs and other content on social media. The paternal grandmother testified that she does not "have TikTok," a social-media application, and that she does not "know really anything about it." She testified that the mother had sent her a message indicating that the child had asked the paternal grandmother to use her cellular telephone to delete the child's social-media accounts; the paternal grandmother stated that she "did not know how to do that." The paternal grandmother also testified that she had shared the mother's concerns about the child's social-media presence in past years, but, she said, the child had "learned her lesson and she's a child and she will continue to learn a lesson." Despite her having

7

reassured the mother that she and the father would try to keep the child from accessing social media, the paternal grandmother testified that the father had purchased for the child a "smartphone" that could access social-media applications. She stated that the child had been told to keep the telephone away from the mother's house because she and the father knew that the mother would not approve of the child's having the phone.

The father admitted that he had allowed the child to access social-media accounts because she has good school attendance, maintains good grades, behaves well, and does her chores around the house. He testified that he monitors the child's social-media use. The father admitted, however, that the child has an account on TikTok, a social-media application, but that he was not aware of her username on that account. He acknowledged that the mother had expressed concerns regarding his purchasing a cellular telephone for the child.

The father testified that he began working for the City of Huntsville on May 16, 2022, that he continued to maintain that employment at the time of the trial, and that he worked from 3:00 p.m. to 11:30 p.m. on weekdays. He stated that he has "had some day shift interviews" and that, if he were to be awarded custody, the paternal grandmother would

supervise the child when he is at work. According to the father, he drinks alcohol on weekends, including, "[o]n occasion," those weekends that he exercises visitation with the child and "occasionally" during the week. He stated that he and the child wanted the child's custody to be modified to allow the child to reside with him.

The paternal grandmother testified that, although she is identified as the supervisor of the father's visits with the child, she had allowed the father to travel in an automobile alone with the child; she stated that the father had taken the child and the child's boyfriend to a movie without her and that the father had taken the child to school without her "a couple of times." The father also testified that he and his girlfriend had taken the child and the child's boyfriend to a movie on a Sunday evening outside the presence of the paternal grandmother and that they had returned home at 11:00 p.m. or 12:00 a.m. that night.

Discussion

The mother first argues on appeal that the juvenile court erred in awarding the father sole physical custody of the child because, she says, the father failed to meet the burden for a modification of custody set forth in Ex parte McLendon, 455 So. 2d 863 (Ala. 1984). We agree. This court

9

outlined the applicable standard of review in <u>Walker v. Lanier</u>, 180 So.

3d 39, 42 (Ala. Civ. App. 2015):

> "'When evidence in a child custody case has been presented <u>ore tenus</u> to the trial court, that court's findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination -- it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented <u>ore tenus</u> before the trial court in a custody hearing. See <u>Ex parte Perkins</u>, 646 So. 2d 46, 47 (Ala. 1994), wherein this Court, quoting <u>Phillips v. Phillips</u>, 622 So. 2d 410, 412 (Ala. Civ. App. 1993), set out the well-established rule:
>
> > "'"'Our standard of review is very limited in cases where the evidence is presented <u>ore tenus</u>. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, <u>Payne v. Payne</u>, 550 So. 2d 440 (Ala. Civ. App. 1989), and <u>Vail v. Vail</u>, 532 So. 2d 639 (Ala. Civ. App. 1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. <u>Gamble v. Gamble</u>, 562 So. 2d 1343 (Ala. Civ. App. 1990); <u>Flowers v. Flowers</u>, 479 So. 2d 1257 (Ala. Civ. App. 1985).'"

"'It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.'

"Ex parte Bryowsky, 676 So. 2d 1322, 1324 (Ala. 1996).

"The law is well settled that '[a] parent seeking to modify a custody judgment awarding primary physical custody to the other parent must meet the standard for modification of custody set forth in Ex parte McLendon[, 455 So. 2d 863 (Ala. 1984)].' Adams v. Adams, 21 So. 3d 1247, 1252 (Ala. Civ. App. 2009). The custody-modification standard set forth in Ex parte McLendon, 455 So. 2d 863 (Ala. 1984), requires that

"'the noncustodial parent seeking a change of custody must demonstrate (1) "that he or she is a fit custodian"; (2) "that material changes which affect the child's welfare have occurred"; and (3) "that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child." Kunkel v. Kunkel, 547 So. 2d 555, 560 (Ala. Civ. App. 1989) (citing, among other cases, Ex parte McLendon, 455 So. 2d 863, 865-66 (Ala. 1984) (setting forth three factors a noncustodial parent must demonstrate in order to modify custody)).'

"McCormick v. Ethridge, 15 So. 3d 524, 527 (Ala. Civ. App. 2008). It is not sufficient for a noncustodial parent seeking a modification of custody to show that he or she is a fit custodian. Id. The noncustodial parent must prove all three McLendon factors in order to warrant a modification of custody. Id."

11

The mother argues that the father failed to present evidence indicating that a material change of circumstances affecting the child's welfare had occurred, that a modification of custody would materially promote the child's welfare, or that the positive good resulting from that modification would more than offset the disruptive effect of uprooting the child. In S.L.L. v. L.S., 47 So. 3d 1271, 1279 (Ala. Civ. App. 2010), this court stated, in pertinent part:

> "'In order to prove a material change of circumstances, the noncustodial parent must present sufficient evidence indicating (1) that there has been a change in the circumstances existing at the time of the original custody judgment or that facts have been revealed that were unknown at the time of that judgment, see Stephens v. Stephens, 47 Ala. App. 396, 399, 255 So. 2d 338, 340-41 (Civ. App. 1971), and (2) that the change in circumstances is such as to affect the welfare and best interests of the child. Ford v. Ford, 293 Ala. 743, 310 So. 2d 234 (1975). The noncustodial parent does not have to prove that the change in circumstances has adversely affected the welfare of the child, but he or she may satisfy the first element of the McLendon test by proving that the change in circumstances materially promotes the best interests of the child. Id.'
>
> "C.D.K.S. v. K.W.K., 40 So. 3d 736, 739-740 (Ala. Civ. App. 2009). Regarding the burden placed on the parent seeking to modify custody, this court has stated: '"'[T]his is a rule of repose, allowing the child, whose welfare is paramount, the

12

valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood.'"' Pitts v. Priest, 990 So. 2d 917, 922 (Ala. Civ. App. 2008) (quoting Ex parte McLendon, 455 So. 2d at 865, quoting in turn Wood v. Wood, 333 So. 2d 826, 828 (Ala. Civ. App. 1976))."

In the present case, as asserted by the mother, the father failed to present evidence indicating that the reason that his visitation was required to be supervised -- his entry into a pretrial-diversion program -- had been resolved by the time of the trial. Although the father testified that the child had exhibited negative emotions related to her time at the mother's house and that, at some point, she had expressed that she did not want to be around the stepfather, the father failed to present evidence regarding the child's reasons for not wanting to be around the stepfather. Similarly, although evidence was presented indicating that the child had exhibited bruising at times, the father failed to present evidence regarding the source of the bruising. The father's testimony establishes that the stepfather and the mother had been in a relationship since shortly after the child was born and that the half brother had been born to them before the 2022 judgment was entered; thus, the stepfather's presence in the child's life and in the mother's house does not represent a change of circumstances since the entry of the

13

2022 judgment. The father testified that the child desired to reside with him. We note, however, that, "although the preference of [a] child is a factor a trial court may consider with regard to custody, it is not controlling." J.K.M. v. T.L.M., 212 So. 3d 931, 939 (Ala. Civ. App. 2016).

Even assuming that the evidence presented by the father indicates that a material change of circumstances had occurred, we cannot conclude that the father has presented sufficient evidence indicating that a change of custody will materially promote the child's welfare. "The McLendon standard is designed 'to minimize disruptive changes of custody because this Court presumes that stability is inherently more beneficial to a child than disruption.' Ex parte Cleghorn, 993 So. 2d [462] at 468 [(Ala. 2008)]." K.U. v. J.C., 196 So. 3d 265, 272 (Ala. Civ. App. 2015). The father testified that the child performs well in school, maintains good grades, and exhibits good behavior. In fact, the only evidence of the child misbehaving related to the child's use of social media when at the father's house, despite the mother's disapproval. The father works from 3:00 p.m. until 11:30 p.m. on weekdays; thus, the paternal grandmother would be providing for the majority of the child's care and supervision on the days that the child attends school. The paternal

grandmother testified, however, that, although she had been ordered to supervise the father's visitation with the child, she had allowed the father to exercise visitation with the child outside of her presence. Additionally, the paternal grandmother testified that she did not know how to delete social-media applications from her cellular telephone and that she was unfamiliar with certain social-media applications. Thus, there is no indication that a modification of custody would promote the child's welfare or that the positive good brought about by the change in custody would offset the inherently disruptive effect of uprooting the child from the home in which she has resided with the mother for her entire life.

Because the evidence presented fails to meet the burden outlined in <u>McLendon</u>, we reverse the juvenile court's judgment insofar as it modified custody of the child.

The mother also argues on appeal that the juvenile court erred in declining to hold the father in contempt despite his admission that he had attended a movie with the child outside the presence of the paternal grandmother and the paternal grandmother's testimony indicating that she had twice allowed the father to drive the child to school without her.

"'The issue whether to hold a party in contempt is solely within the discretion of the trial court, and a trial court's

15

contempt determination will not be reversed on appeal absent a showing that the trial court acted outside its discretion or that its judgment is not supported by the evidence.' <u>Poh v. Poh</u>, 64 So. 3d 49, 61 (Ala. Civ. App. 2010). 'To hold a party in contempt under either Rule 70A(a)(2)(C)(ii) or (D), Ala. R. Civ. P., the trial court must find that the party willfully failed or refused to comply with a court order.' <u>T.L.D. v. C.G.</u>, 849 So. 2d 200, 205 (Ala. Civ. App. 2002)."

<u>J.S.S. v. D.P.S.</u>, 281 So. 3d 434, 437-38 (Ala. Civ. App. 2019).

Although the evidence presented indicates that the father had exercised visitation with the child outside the supervision of the paternal grandmother on three occasions, the mother failed to elicit evidence from the father indicating the reasons for those unsupervised interactions or that his actions in contravention of the terms of the 2022 judgment were willful. Accordingly, we decline to reverse that part of the juvenile court's judgment declining to hold the father in contempt of court.

Conclusion

Based on the foregoing, we reverse the juvenile court's judgment insofar as it modified the custody of the child, and we remand the case for the entry of a judgment consistent with this opinion. We affirm the judgment insofar as the juvenile court declined to hold the father in contempt.

16

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Edwards, Hanson, Fridy, and Bowden, JJ., concur.